**Robert L. WILLIAMSON; Liberty Mutual Insurance Company, Intervenor,**

v.

**CONSOLIDATED RAIL CORPORATION**

v.

**NASHVILLE AND ASHLAND CITY RAILROAD COMPANY; Star Trailer Services, Inc.; and Miller Trailers, Inc.**

**Robert L. Williamson, Appellant.**

**No. 90–5421.**

United States Court of Appeals, Third Circuit.

Argued Oct. 11, 1990.

Decided Feb. 28, 1991.

Rehearing and Rehearing In Banc Denied March 29, 1991.

**1346**

Neil J. Rovner, (argued), Angino & Rovner, P.C., Harrisburg, Pa., for appellant.

David C. Eaton, (argued), Nauman, Smith, Shissler & Hall, Harrisburg, Pa., for appellee Consolidated Rail Corp.

Before GREENBERG, HUTCHINSON and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

### I.

Robert Williamson (Williamson) appeals from an order of the United States District Court for the Middle District of Pennsylvania granting appellee Consolidated Rail Corporation's (ConRail's) motion for judgment n.o.v. on a claim brought by Williamson for damages pursuant to the Federal Employers' Liability Act (the Act), 45 U.S.C.A. §§ 51–60 (West 1986). Williamson, who was on the payroll of a ConRail subsidiary, Pennsylvania Truck Lines (Penn Trucks), claimed he was nevertheless an "employee" of ConRail within the meaning of the Act, when he suffered serious personal injuries operating a forklift at one of ConRail's freight terminals, the Lucknow Railway Yard (the Terminal). In a bifurcated trial, the district court first asked the jury to decide whether Williamson was a ConRail employee for the purposes of the Act and then requested it to determine liability and fix damages. After the jury decided that Williamson was a ConRail employee, it awarded him $607,500.00 [1] for the personal injuries he suffered at the Termi-

nal. After return of the verdict, ConRail moved for judgment n.o.v. or, in the alternative, a new trial. In its motion, ConRail attacked the jury's finding that Williamson was employed by it when he was injured. The district court held that no reasonable jury could have found that Williamson was employed by ConRail when he was injured, granted ConRail's motion for judgment n.o.v. and dismissed the case for lack of subject matter jurisdiction under the Act. In accordance with Federal Rule of Civil Procedure 50(c)(1), the district court also granted ConRail a conditional new trial, holding that even if the evidence was sufficient to show that Williamson was a ConRail employee when injured, the jury's verdict on causation and damages was against the weight of the evidence. Williamson appealed.

We conclude that the evidence was sufficient to support the jury's finding that Williamson was ConRail's employee at the time of his injury. We also conclude that the jury's finding that Williamson suffered damages totaling $607,500.00 as a result of the injuries he sustained October 23, 1986, did not result in a miscarriage of justice. Accordingly, we will reverse the district court's order entering judgment n.o.v. for ConRail, vacate its order conditionally granting a new trial and remand the case with instructions to reinstate the jury verdict in Williamson's favor.

### II.

The facts are these. Williamson had been a Penn Trucks employee since 1978. He received his paycheck from Penn Trucks and took his orders from its employees. In 1983 he suffered injuries in an accident. After this injury, Williamson worked sporadically until September 1986, when he returned to work full time. On October 23, 1986, when he sustained the injuries that formed the basis of this suit, he was on the payroll of Penn Trucks. There was conflicting evidence on the extent to which he was still suffering from the effects of the 1983 accident when rein-

---

**1.** The jury found that Williamson suffered $675,000.00 in damages but found him to be ten percent negligent and reduced his award to $607,500.00.

jured and the extent to which the 1983 injuries contributed to the disability he suffered after the October 23 accident.

Penn Trucks is a wholly owned subsidiary of ConRail, and has a contract with ConRail to handle the loading and unloading at the Terminal, including the transfer of lading from damaged to undamaged trailers. Williamson's normal duties for Penn Trucks involved operating various types of heavy equipment to move trailers and load and unload sealed trailers from train cars at the Terminal, an intermodal yard. An intermodal yard is a rail terminal where cargo is transferred from rail cars to trucks, usually in the same large containers. *See generally* Transportation Research Bd., Nat'l Research Council, Urban Public Transp. Glossary 30, 64–65 (B. Gray ed. 1989) (discussing intermodal facilities).

As operations were normally conducted at the Terminal, ConRail clerks working there simply supplied Williamson with a list of trailers to load onto train cars. His Penn Trucks supervisor would then give him a list of train cars to unload. The ConRail clerks did not give him any further directions, with the exception of an occasional suggestion concerning the order in which they would like the work done. On October 23, 1986, things were done somewhat differently. On that day, Williamson was called upon to transfer cargo from a damaged trailer to another, presumably undamaged. It was ConRail's responsibility to inspect the trailers for damage and to choose which trailer would receive cargo from a damaged trailer. In this case, ConRail had dispatched a damage inspector from outside the Terminal yard to deal with the cargo Williamson was called upon to transfer.

To effect the transfer of cargo between the damaged and undamaged trailers, Williamson aligned the two trailers on opposite sides of a flatbed trailer (flatbed). When this was done, a forklift was lifted onto the flatbed and Williamson used it to pick up cargo from the damaged trailer and deposit it into the undamaged one. This required him to drive the forklift back and forth across the flatbed from one trailer to the other until all the cargo was transferred.

While Williamson was transferring the cargo, ConRail's damage inspector stood on the flatbed and checked the condition of the goods as Williamson removed them from the damaged trailer and loaded them into the undamaged one. At trial, Williamson testified that he considered himself under the control and direction of this inspector.

The record shows that no one from Penn Trucks acted as an intermediary between the ConRail inspector and Williamson nor did Penn Trucks have to approve orders given by the inspector regarding the cargo transfer. The damage inspector told Williamson when to stop the cargo transfer, when to resume it and how to place the cargo in the replacement trailer.

In shuttling the cargo from the damaged trailer to the undamaged trailer, Williamson had to operate his forklift inside each trailer. When the transfer of cargo was almost finished, the new trailer collapsed while Williamson was inside it. Both he and the forklift were thrown against a load of cargo and Williamson was injured. A subsequent investigation cleared Williamson of any fault for the accident.

### III.

We have appellate jurisdiction pursuant to 28 U.S.C.A. § 1291 (West Supp.1990) over the district court's final order dismissing Williamson's claim under the Act for lack of subject matter jurisdiction. The finality of that order is not affected by the district court's conditional grant of a new trial. *See* Fed.R.Civ.P. 50(c)(1). The propriety of the district court's order granting a conditional new trial is also subject to review in Williamson's appeal since it is combined with the granting of ConRail's motion for judgment n.o.v. *See Silverii v. Kramer,* 314 F.2d 407, 413 (3d Cir.1963). *See generally* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2540 at 618 (1971) (discussing appellate review of orders granting and denying motions for judgment n.o.v. and motions for a new trial).

■ Our review of the district court's order granting ConRail's motion for judgment n.o.v. is plenary. *See EEOC v. Delaware Dep't of Health & Social Servs.*, 865 F.2d 1408, 1413 (3d Cir.1989) (citing *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 113 (3d Cir), *cert. denied*, 484 U.S. 853 (1987)). The question of whether the district court had subject matter jurisdiction under the Act as a matter of jurisdiction is a legal question subject to plenary review, *see Connors v. Bethlehem Mines Corp.*, 862 F.2d 461, 463 (3d Cir.1988), but determination of the legal issue depends on resolution of the underlying factual question concerning Williamson's status as an employee of ConRail at the time of the accident.

More specifically, we examine the record to determine whether the evidence presented was sufficient to permit the jury to find that Williamson was ConRail's employee when he was injured. *See Baker v. Texas & Pac. Ry. Co.*, 359 U.S. 227, 228, 79 S.Ct. 664, 665, 3 L.Ed.2d 756 (1959) (per curiam) (whether a person is a railroad employee for purposes of the Act is a factual matter that must be left to the jury whenever reasonable minds can come to different conclusions on the issue of who was the employer). When reviewing the jury's finding that Williamson was employed by ConRail, we give him, as verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him. *See Simone v. Golden Nugget Hotel & Casino*, 844 F.2d 1031, 1034 (3d Cir.1988).

■ We review the district court's order granting ConRail a conditional new trial for abuse of discretion. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir.1988). That discretion is, however, limited by the Seventh Amendment's guarantee of a jury trial. The constitutional guarantee has particular force when a new trial is granted because the district court, as here, has determined that the jury's verdict was against the weight of the evidence. *Id.* at 735 n. 35 (citing *Lind v. Schenley Indus.,*

*Inc.* 278 F.2d 79, 90 (3d Cir.) (in banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960)). In such a situation, we examine the record to see if the district court could have reasonably concluded that a miscarriage of justice would occur if the jury's verdict were left stand. *See Shanno v. Magee Indus. Enters., Inc.*, 856 F.2d 562, 567 (3d Cir.1988).

## IV.

■ To deal with ConRail's argument that no reasonable jury could conclude that Williamson was ConRail's employee when he was injured on October 26, 1986, we turn to the Supreme Court's analysis in *Kelley v. Southern Pac. Co.*, 419 U.S. 318, 95 S.Ct. 472, 42 L.Ed.2d 498 (1974). *Kelley*'s holding is based on the insufficiency of the evidence to show a sub-servant basis for creation of the employer-employee status. *See id.* at 323–26, 95 S.Ct. at 475–77. Williamson's case, however, is not necessarily premised on the sub-servant principle. It has elements of the borrowed servant and dual servant concepts. They provide alternate bases for recognition of an employer-employee relationship.

In *Kelley*, a workman brought an action against a railroad to recover for injuries he suffered while unloading automobiles from a railroad car. The district court entered judgment for the workman and the court of appeals reversed. The Supreme Court granted certiorari. *Id.* at 320–21, 95 S.Ct. at 474–75.

The district court had specifically found that the motor carrier who had the workman on its payroll was serving generally as agent of its parent, a railroad; that the carrier's employees were agents of the railroad for purposes of the unloading operation and that the work was being performed to fulfill a non-delegable duty of the railroad. The Supreme Court held the district court's findings were insufficient to create an employer-employee status between the railroad and the workman within the meaning of the Act. *Id.* at 321–23, 95 S.Ct. at 474–76. The Court held the sub-servant concept did not apply because employees of the motor carrier, not the rail-

road, supervised and controlled the unloading relationship and the evidence was otherwise insufficient to create a sub-servant relationship despite the railroad's non-delegable responsibility for the unloading. *See id.* at 325–26, 95 S.Ct. at 476–77.

The Court, however, did not simply affirm the court of appeals order reversing the district court's judgment for the workman. It vacated that order and sent the case back to the district court for a factual determination of whether the workman was a servant of the railroad when he was injured under any of the common law bases for creation of a master-servant relationship. *Id.* at 323–24, 331–32, 95 S.Ct. at 479–80. The common law principles recited were: (1) whether the workman was at the time of his injuries serving as the borrowed servant of the railroad; (2) whether he was a dual servant acting for two masters simultaneously; and (3) whether he was "a subservant of a company that was in turn a servant of the railroad." *Id.* at 324, 95 S.Ct. at 476.

■ Either the dual servant or the borrowed servant doctrine can serve to create an employer-employee relationship under the Act. With respect to the dual servant doctrine, the Second Restatement of Agency says:

A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other.

Restatement (Second) of Agency § 226. The borrowed servant doctrine states:

A servant directed or permitted by his master to perform services for another may become the servant of such other in performing such services. He may become the other's servant as to some acts and not as to others.

*Id.* § 227. The Supreme Court referred to these definitions in *Kelley. See Kelley,* 419 U.S. at 324, 95 S.Ct. at 476. The Supreme Court noted that none of the district court's findings suggested that consideration had been given to either the borrowed servant or the dual servant doctrine

as a basis for liability. *Id.* at 325, 95 S.Ct. at 476–77. It went on to say:

[A] finding of agency is not tantamount to a finding of a master-servant relationship. See Restatement (Second) of Agency § 2. The finding that the railroad was "responsible" for the unloading operations is significantly weaker than would be a finding that it controlled or had the right to control the physical conduct of the [motor carrier] employees in the course of their unloading operations. The railroad would satisfy the District Court's "responsibility" test whenever it agreed to perform a service and subsequently engaged another company to perform that service for it on its premises. The "control or right to control" test, by contrast, would be met only if it were shown that the role of the second company was that of a conventional common-law servant. Accordingly, we agree with the Court of Appeals that the District Court's test for [the Act's] coverage was too broad.

*Id.* at 325–26, 95 S.Ct. at 476–77 (footnote omitted).

*Kelley* expressly recognizes the borrowed servant and the dual servant concepts as alternate bases for recognition of the employer-employee relationship. ConRail cannot rest its case on *Kelley* because Williamson's claim does not necessarily depend on a sub-servant relationship. ConRail's argument that Williamson was not its employee because the evidence here showed only that Penn Trucks was ConRail's agent for the transfer of the cargo from the damaged to the undamaged trailer and therefore that Williamson himself was no more than a sub-servant responsible to and under the control of Penn Trucks is not conclusive on the employment question. As the Supreme Court stated in *Kelley,* the relationship between a master and his servant is distinguished from the general relationship between a principal and his agent by the master's power to control and direct the servant in his efforts to perform the task the master has assigned him. *See id.* at 323–28, 95 S.Ct. at 475–78.

Before *Kelley* was decided, we said in *Tarboro v. Reading Co.*, 396 F.2d 941 (3d Cir.1968), *cert. denied*, 393 U.S. 1027, 89 S.Ct. 637, 21 L.Ed.2d 569 (1969):

> The primary factor to be considered in determining whether a plaintiff was employed by the defendant [under the Act] is whether the latter had the power to direct, control and supervise the plaintiff in the performance of his work at the time he was injured. Relevant factors to be considered are: who selected and engaged the plaintiff to do the work; who paid his wages for performing it; who had the power to terminate his employment; who furnished the tools with which the work was performed and the place of work.

*Id.* at 943. More recently, the United States Court of Appeals for the Fifth Circuit has stated the legal test this way:

> Three general principles of law guide our decision. The first is that under the [Act] a worker can be the "employee" of a railroad even though carried on the employment rolls of another company and paid by that other company. The test of employment is the established test in workers' compensation cases. It is whether the railroad has control of the employee or the right to control the employee. The law does not require that the railroad have full supervisory control. It requires only that the railroad, through its employees, plays "a significant supervisory role" as to the work of the injured employee.

*Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322, 1324 (5th Cir.1985) (citing *Kelley*, 419 U.S. at 327, 95 S.Ct. at 477–78). Thus, our Court before *Kelley*, then the Supreme Court in *Kelley*, and now the Fifth Circuit in *Lindsey* have emphasized the control factor in determining the employer-employee status under the Act.

■ Again in Williamson's case, the factual issue before the jury included direct control, as well as indirect control through sub-agency. Use of the sub-servant principle to show a master-servant relationship, and hence establish control, is unnecessary when there is evidence that a borrowed servant is directly subject to the control of the railroad. *See Kelley*, 419 U.S. at 324, 95 S.Ct. at 476. Here, there is evidence that ConRail directly controlled Williamson's activities when he was injured on October 23, 1986. This evidence is sufficient to support the jury's finding that Williamson was either ConRail's borrowed servant or the dual servant of ConRail and Penn Trucks when he was injured. To show why, we turn to an analysis of the evidence about the relationship between Williamson and ConRail on October 23, 1986, at the time he was injured.

The evidence that shows an employer-employee relationship between Williamson and ConRail includes evidence of the relationship between ConRail and Penn Trucks. Penn Trucks is ConRail's wholly owned subsidiary. ConRail itself previously performed the same operations now delegated to Penn Trucks with the same type of equipment Penn Trucks employs. Penn Trucks shares office space with ConRail. ConRail clerks have the power to assign work to Penn Trucks employees and change assignments previously given them by Penn Trucks supervisors. Because ConRail is responsible for the cargo while it is within the sealed trailers in the terminal, ConRail inspectors designate the use of the trailer and control the cargo transfers between trailers, even though those transfers are performed by Penn Trucks employees. In this case, the defective replacement trailer that Williamson was directed to use was chosen by ConRail.

When damaged trailers had to be handled at the terminal, the record shows that either ConRail or Penn Trucks could transfer the load. Williamson testified that Penn Trucks would give the service if ConRail requested it. Williamson testified that he treated the inspector as his supervisor on the day of the accident and that the identity of the persons he took orders from depended on the job he was doing. Specifically, he testified that in making cargo transfers the person who was permitted to give him instructions was "the ConRail inspector. He could stop me, stop me at any given time or restart me." Appendix (App.) at 184–85. Even in the absence of

an inspector, ConRail clerks determined upon what train a trailer was to be loaded. In loading and unloading trailers on and off railroad cars, Williamson took "orders from ConRail, ConRail clerks, store house supervisors and Penn Trucks dispatchers." *Id.* at 184. When a damaged trailer arrived at the terminal and was taken off a rail car, Penn Trucks notified ConRail. Significantly, the ConRail damage people, including the inspector ConRail dispatched to the Terminal on October 23, 1986, did not work out of the Lucknow intermodal yard. They were based "across the river" in Shiremanstown, Pennsylvania. *Id.* at 301.

In general, once ConRail was notified that a trailer had been unloaded from a train, Penn Trucks' job regarding the trailer ended. Upon notification that a damaged trailer had arrived at the terminal, ConRail would send a damage prevention person to the terminal to inspect the damage. That person would break the seals on the trailer, open the trailer and check the lading inside for damage. A ConRail damage person had to be present not only to inspect the damages but also to be sure that transferred goods remained secure during the transfer. Accordingly, Williamson had to wait for the ConRail cargo inspector before making the transfers so ConRail could ascertain whether any cargo had been damaged before transfer.

There is evidence that a Penn Trucks supervisor usually would be there at the outset to see that the work was started. After he left, the ConRail person would remain there while the work was performed. The fact that the presence of a Penn Trucks supervisor was not required during the transfer is telling. If the order of loading had to be changed for some reason, the inspector would be responsible for informing Williamson of that change.

When Williamson arrived at work on the morning of the accident, the Penn Trucks dispatcher told him to talk to the ConRail people about getting an undamaged trailer to take up to the site of the damaged trailer. The ConRail clerk then told Williamson to "just go ahead and get [one of] these trailers and set it up...." *Id.* at 171.

Williamson was advised that "there was a NACZ trailer that had come into the yard and was in good shape, [and that] they would transfer from a NACZ to a NACZ. They [gave] me the number, the NACZ and the number of the trailer." *Id.* Unfortunately, the empty trailer selected by ConRail did not turn out to be so "good" and a defect in it caused Williamson's injury.

As Williamson said at trial: "The ConRail people will tell [Penn Trucks] if [the load] has to go back in the same way or you can just pull it out, put in the next one and that's about the extent of it." *Id.* at 275. He went on to testify that the ConRail inspector was there to explain how he wanted things accomplished.

We have recited at length some, but not all, of the evidence that supports Williamson's status as a ConRail employee. In general, that evidence falls into several categories. It shows the close relationship between ConRail and Penn Trucks, a relationship in which ConRail employees sometimes gave direction to Penn Trucks employees. It also shows that ConRail was responsible for the cargo and that ConRail, not Penn Trucks, was authorized to break open the seals of damaged trailers. Finally, it shows that the transfer of cargo from damaged trailers to undamaged trailers was not a usual task for Williamson and that the only person present to tell him how to do it was a ConRail employee.

We recognize that the jury's finding that Williamson was ConRail's employee when he was injured was a finding inferred from evidence that did not directly show the requisite power to control. Indeed, a reasonable jury could have inferred that neither ConRail nor its inspector had the power to direct or control Williamson and that he remained solely Penn Trucks' servant when he was injured on October 23, 1986. In short, some of the evidence supports ConRail's version of the relationship. For example, there was testimony that ConRail had delegated general responsibility for the operation of the intermodal terminal to Penn Trucks; that the employees of Penn Trucks, including Williamson, are members of the Teamsters Union, not members of

the railroad union; that Williamson got his paychecks from Penn Trucks; that he was ordered to work on the day of the accident when a Penn Trucks dispatcher called him at home; that ConRail employees did not normally instruct Penn Trucks employees on the details of the work they were doing; and that the contract between ConRail and Penn Trucks expressly removed from ConRail any authority to supervise or direct the manner in which Penn Trucks performed any of its services.

Nevertheless, as we have shown, the evidence supporting Williamson's version of the relationship between ConRail and him at the time he was injured is sufficient to allow a reasonable jury to infer that Williamson was subject to ConRail's control and direction when he was injured. It follows that the evidence was sufficient to permit a jury to find that Williamson was either ConRail's borrowed servant or a dual servant of Penn Trucks and ConRail when he was injured without regard to the subservant concept. Under the Restatement definitions referred to earlier and embraced by the Supreme Court in *Kelley,* Williamson was an employee of ConRail within the meaning of the Act as either a borrowed servant or a dual servant because he was subject to ConRail's control when he was injured. The jury's verdict for Williamson on his employee status must be reinstated and therefore, we must also reverse the district court's order granting ConRail's motion for judgment n.o.v.

### V.

■ Our reversal of the order granting judgment n.o.v. requires us to consider the district court's conditional grant of a new trial. Federal Rule of Civil Procedure 50(c)(1) provides:

> If the motion for judgment notwithstanding the verdict, provided for in subdivision (b) of this rule, is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or deny-

ing the motion for a new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment. In case the motion for a new trial has been conditionally granted and the judgment is reversed on appeal, the new trial shall proceed unless the appellate court has otherwise ordered.

■ When the district court grants a motion for a new trial based on the weight of the evidence, the court has:

> to some extent at least, substituted [its] judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial.

*Lind,* 278 F.2d at 90. Accordingly, the district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. *Delaware Dep't of Health,* 865 F.2d at 1413 (quoting *Shanno,* 856 F.2d at 567). Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations such as passing "upon the nature of an alleged newly discovered organic compound in an infringement action." *Lind,* 278 F.2d at 90–91.

Here, the district court granted ConRail's motion for a new trial because of weaknesses in the evidence Williamson presented concerning the cause of his disability. The record shows that Williamson had been injured in a previous accident in 1983. The district court felt that a substantial part of Williamson's present disability was attributable to the 1983 acci-

dent and not the collapse of the replacement trailer on October 23, 1986.

Admittedly, the evidence on Williamson's physical condition was not overwhelming. Williamson's medical expert, Dr. Eduardo S. Violago (Dr. Violago) made statements on direct examination that he then contradicted on cross-examination. Moreover, the doctor's testimony conflicted with some of Williamson's own statements about his condition. However, on redirect, Dr. Violago said: "[T]he current problems have overshadowed the previous problems, and, therefore, have appeared to be directly related to the accident on October 23, 1986." App. at 152.

ConRail's medical expert, Dr. Robert C. Steinman (Dr. Steinman), gave an opinion that the 1983 injury caused Williamson's disability and the 1986 accident merely aggravated a pre-existing condition. Although the distinction between aggravation and reinjury is fine, Williamson, his son and his daughter all testified that he had made almost a total recovery from the 1983 accident before being reinjured in 1986.

Despite the limited nature of the district court's discretion in granting a new trial because a jury's verdict is against the weight of the evidence, we recognize that considerable deference remains due to that court's determination that a verdict is against the weight of the evidence. The trial judge observes "the witnesses and follow[s] the trial in a way that we cannot replicate by reviewing a cold record." *Roebuck*, 852 F.2d at 735. Nevertheless, new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience. *See Delaware Dep't of Health*, 865 F.2d at 1413. We cannot read this record as meeting that standard.

We are fortified in our conclusion by statements in the record that indicate the district court substituted its credibility judgment for the jury's. In granting the motion for a new trial, the district court seems to have credited Dr. Steinman, Con-Rail's medical witness, and discredited Dr. Violago, Williamson's medical witness. For example, the district court stated that "there is evidence in Dr. Violago's deposition to support the plaintiff's position," App. at 611, but that certain evidence in Dr. Violago's deposition "coupled with the testimony of Dr. Robert C. Steinman, show that the great weight of the evidence would support the grant of a new trial." *Id.* If Dr. Violago's weak and sometimes contradictory testimony were all that Williamson had on causation and damages, this case would come close to those in which it can be said that while the evidence is sufficient to support the jury's findings, a new trial is appropriate because those findings leave the court with a fixed and firm impression that a serious mistake has been made. *See, e.g., Roebuck*, 852 F.2d at 736–37 (reversing district court's grant of judgment n.o.v., but affirming grant of new trial because of "overwhelming" evidence).

But Williamson's case does not rest solely on Dr. Violago's testimony. The record also shows that much of Williamson's disability was attributable to the pain he suffered as a result of his injuries. How long his disabling pain continued after the 1983 injury and the extent to which it recurred after the 1986 accident was a jury question. While pain is subjective, Williamson's contentions with respect to its recurrence and its relation to the 1986 accident are supported by his own testimony, that of his daughter and his son, as well as his medical witness, Dr. Violago. All said that Williamson's pain got worse after the 1986 accident. The district court's statements do not give any indication that it credited, or even considered, either Williamson's testimony or the testimony of his son and daughter that he had made almost a full recovery before the 1986 accident. Williamson's damage theory at trial was that he was able to work intermittently with pain after the 1983 accident but was wholly disabled from pain after and because of the 1986 accident. Dr. Violago said that in his opinion this resulted from the 1986 acci-

dent. Williamson's family's testimony supports that opinion.

The jury apparently believed all this evidence. While ConRail's medical evidence contradicts it, the record does not demonstrate the miscarriage of justice that would permit the district court to hold the jury's damage verdict was against the weight of the evidence. Accordingly, we hold that the district court erred in granting ConRail's motion under Federal Rule of Civil Procedure 50(c)(1) for a conditional new trial.

### VI.

For the foregoing reasons, we will reverse the district court's order granting ConRail's motion for judgment n.o.v., vacate its grant of a conditional new trial and will remand this case to the district court with instructions to enter judgment upon the verdict in favor of Williamson for the amount of $607,500.00.

NYGAARD, Circuit Judge, dissenting.

Because I disagree that Williamson became an employee of ConRail on October 23, 1986 as either a borrowed or a dual servant, I respectfully dissent. Because I believe the majority opinion does not adequately review the respective duties and activities of the parties in this case, I will briefly summarize the pertinent facts.

On the day of Williamson's accident, he was called by a Penn Trucks dispatcher to transfer lading from a damaged trailer to a new trailer. Williamson used a Penn Trucks street trailer to pick up a flatbed trailer. He then positioned his flatbed next to the damaged trailer. After asking a ConRail clerk which empty trailer he should transfer the lading into, Williamson himself positioned this empty trailer at the end of the flatbed.

Because ConRail may be responsible for damage to cargo it carries, ConRail damage inspectors are generally present when damaged cargo is transferred. The damage inspectors' presence is necessary so ConRail can note the extent of the damage

for its records and insure that no loss occurs in the transfer. Consequently, after setting up for the transfer of lading, Williamson waited for a ConRail inspector to arrive before proceeding. David Estes, an inspector employed by ConRail, arrived sometime later and the transfer of lading began.

Williamson used a forklift to remove pallets of cargo from the damaged trailer. After backing out with a load onto the flatbed, Williamson would stop to allow the damage inspector to inspect the cargo. Williamson would then place the pallet into the new trailer. Estes testified at trial that it was not his responsibility to tell Williamson how to transfer the lading. When Williamson asked him how the cargo should be placed in the new trailer, Estes suggested that Williamson alternate pallets on each side of the trailer. Estes further testified that he did not know how to operate a forklift and could not have told Williamson how to transfer the load.

The issue is quite simple: Did ConRail have the right to control Williamson on the job during which he was injured? Unquestionably, it did not. Viewing the evidence in the light most favorable to Williamson, I conclude that the district court properly granted JNOV to ConRail. Williamson independently set up the trailers for transfer in accordance with Penn Trucks procedures and operated his forklift without direction from anyone. Transfer of lading is a duty of Penn Trucks under its contract with ConRail. The presence of a ConRail inspector is necessary only so ConRail can note the extent of the damage to the cargo. Estes would occasionally stop Williamson so he could check for damage and he suggested how Williamson might pack the load to minimize future damage.

The majority states, "there is evidence that ConRail directly controlled Williamson's activities when he was injured on October 23, 1986." Maj. Op. at 1350. This is not so. One clerk, not a supervisor, gave Williamson the number and location of an empty trailer. The clerk's job is to know

where undamaged trailers are located.[1] One inspector, not a supervisor, checked the lading for damage as Williamson removed it and placed it in the undamaged trailer. Neither of these people had any right to control Williamson: They were coordinating their efforts with him. These minimal interactions do not establish control or an employment relationship, but rather represent "the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 330, 95 S.Ct. 472, 479, 42 L.Ed.2d 498 (1974) *(citing Del Vecchio v. Pennsylvania R.R. Co.*, 233 F.2d 2 (3d Cir.1956)). *Accord, Warrington v. Elgin, Joliet & Eastern R.R. Co.*, 901 F.2d 88, 91 (7th Cir.1990). Because I believe the district court properly granted JNOV to ConRail, I dissent.[2]

See also 728 F.Supp. 1150.

---

1. Indeed, Williamson concedes that this type of interaction was common and did not give rise to an employment relationship. Appellant's Brief p. 6

2. Because I conclude that the district court properly dismissed this case, I will not consider the district court's alternative grant of a new trial.