Don G. ANCELET, Jr.

v.

NATIONAL RAILROAD PASSENGER CORP.

Civil Action No. 94–0297.

United States District Court,
E.D. Louisiana.

Nov. 13, 1995.

A. Remy Fransen, Christopher Joseph Fransen, Fransen & Hardin, New Orleans, LA, Kenneth Wayne Tanana, Kenneth Tanana, New Orleans, LA, for Don G. Ancelet, Jr.

Deborah Bila Rouen, Martin Alan Stern, Albert Kirk Gasperecz, Adams & Reese, New Orleans, LA, David Stuart Kelly, Nicole Duarte Martin, Lemle & Kelleher, New Orleans, LA, for National R.R. Passenger Corp.

Renee Summer Melchiode, Hoffman, Sutterfield, & Ensenat, Poydras Center New Orleans, LA, James Melville Taylor, Taylor, Wellons & Politz, New Orleans, LA, for National Union Fire Insurance Company of Pittsburgh, Pennsylvania.

### *ORDER AND REASONS*

VANCE, District Judge.

This matter is before the Court on the Motion of National Railroad Passenger Cor-

poration ("NRPC") for Summary Judgment. For the reasons set forth below, NRPC's Motion for Summary Judgment is **granted.**

### INTRODUCTION

Plaintiff, Don G. Ancelet, Jr. ("Ancelet"), filed suit under the provisions of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, seeking damages for personal injuries allegedly sustained while providing pest control services to an NRPC railroad car. Ancelet's complaint alleges that he was "nominally employed" by Redd Pest Control ("Redd") as a pest controller, while actually employed by NRPC. Complaint at ¶¶ VII & VIII. Ancelet claims that he was injured while servicing a railcar when an unknown assailant ran from the bathroom area and knocked him to the ground. Complaint at ¶ X.

### ANALYSIS

■ FELA provides that a railroad is liable for negligently causing the injury or death of any person "while he is employed" by the railroad. 45 U.S.C. § 51 (West 1995). Therefore, NRPC may be liable to Ancelet only if Ancelet can establish the requisite employment relationship. Ancelet may establish "employment" for FELA purposes by showing that he: (1) served as a borrowed employee; (2) acted for two masters simultaneously; or (3) was a subservant of a company that was in turn a servant of the railroad. *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 324, 95 S.Ct. 472, 476, 42 L.Ed.2d 498 (1974). Plaintiff asserts that he was the borrowed employee of the railroad.

The district court decides the borrowed employee issue as a matter of law, and if the material facts are undisputed, the court may grant summary judgment. *Capps v. N.L. Baroid–NL Industries, Inc.*, 784 F.2d 615, 617 (5th Cir.), *cert. denied*, 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986), *citing Gaudet v. Exxon*, 562 F.2d 351, 357–59 (5th Cir.), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56

L.Ed.2d 414 (1978). In this case, the facts are undisputed. Ancelet and NRPC simply argue that different legal conclusions should be drawn from the undisputed facts. The following examination of the facts and applicable law reveals that Ancelet is not NRPC's borrowed employee.

### FACTUAL BACKGROUND

Plaintiff signed an employment contract with Redd to serve as a pest control service technician, committing himself to do pest control work exclusively for Redd during the term of his agreement and for two years thereafter. NRPC Exhibit C(1), Employment Agreement.[1] Redd had been engaged to perform pest control services for NRPC in accordance with pest control specifications adopted by NRPC and Redd's affiliate, Copesan Services, Inc., a national pest control and sanitation company. *Id.*, Ex. A, Affid. of Ted A. Bruesch, Jr. & Ex. A(2), Specifications for Railcars and Maintenance Facilities ("specifications"). Under the terms of the specifications, Copesan and its affiliates such as Redd were obligated to provide licensed pest control technicians to perform pest control services for NRPC on a national basis and to furnish the necessary material and equipment to perform those services. *Id.* NRPC submitted evidence that the pest control specifications were developed by the pest control company and approved by the railroad. *Id.* Ex. A at ¶ 5; Ex. B, Affid. of R. Butler, ¶ 6. Plaintiff was unable to contradict this assertion with competent evidence.[2]

Although plaintiff states that NRPC did not always follow the specifications, the specifications provided in detail how and when the railcars were to be treated for pests and which chemicals were to be used. *Id.* Ex. A(2), Specifications. But for plaintiff, whose status as a putative employee is in issue, NRPC had no licensed pest control operators on its payroll and held no such license itself. NRPC Ex. B, Affid. of R. Butler, ¶¶ 3, 10.

---

1. NRPC "Exhibits" refer to the exhibits attached to NRPC's Motion for Summary Judgment. NRPC "Reply Exhibits" refer to the exhibits attached to NRPC's Reply Memorandum. "Ancelet Exhibits" refer to exhibits attached to Ancelet's Opposition Memorandum.

2. Plaintiff relies, for example, on statements in an affidavit by Benedict Montalbano that Amtrak supplied pest control specifications. However, Montalbano admitted at his deposition that he had no personal knowledge of how these specifications were developed. NRPC Reply Ex. C at 38–39.

Louisiana law requires a structural pest control license or registration to do pest control work. La.R.S. 3:3368(A).

Plaintiff was Redd's only full-time night employee. *Id.* Ex. D, Ancelet Depo. at 36. When Ancelet was hired by Redd, he was told that NRPC was to be the primary and priority account on his route. *Id.* at 34. Redd told him that NRPC required Redd to have technicians available 24 hours a day, seven days a week. *Id.* at 34–35. Nevertheless, plaintiff had 35–40 different customers on his route to service every month. *Id.* at 227–28. Although Ancelet stated that he spent 80% to 90% of his time at NRPC, he did not have to report to NRPC every night unless he was called. *Id.* at 226–28. NRPC summoned Ancelet through Redd's answering service or by beeping him directly.

Plaintiff used a Redd company truck for transportation, wore a Redd uniform and was reimbursed his travel expenses by Redd. *Id.* at 218, 220, 226. Redd installed its own shed at the NRPC terminal yard where it stocked the chemicals and supplies used by its technicians. *Id.* Ex. E, D. Davis depo. at 131–32. This included Vikane, extension cords, fans, invoices, hoses, tape, oxygen, respirators, and other supplies needed by plaintiff to do his job. *Id.* Ex. D, Ancelet depo. at 222. When plaintiff made out-of-pocket expenditures for supplies, he was reimbursed by Redd. *Id.* at 219–220. If he ran low on chemicals or other supplies, he would notify Redd. *Id.* at 223. Plaintiff often borrowed hand tools, such as a flashlight, from NRPC and sometimes used an NRPC fan to aerate a fumigated area more quickly. Ancelet depo. Ex. A, at 266.

Plaintiff received his paychecks from Redd and was paid a set draw plus commission, based on the type and volume of his work. NRPC Ex. D, Ancelet depo. at 218, 232. He was offered health insurance benefits from Redd. *Id.* at 235. He was expected to follow Redd's job procedures, to undergo training at Redd, and to attend meetings at Redd. *Id.* Ex. E, D. Davis depo. at 154–55. NRPC had a separate job application and hiring process, training program, medical and retirement benefits, and vacation policies for its employees. *Id.* Ex. B, R. Butler Affid. at ¶ 14.

In response to a deposition question concerning whether he was presently employed, plaintiff volunteered "Yes, With Redd Pest Control." *Id.* Ex. D, Ancelet depo. at 5. Plaintiff admitted that he had never been terminated as a Redd employee, but he understood that he had to do what he needed to do to make the Amtrak account happy. *Id.* at 218–19. Plaintiff stated that if he wanted to take a night off or to get a replacement, he would have to ask permission from Redd. *Id.* at 232. If Ancelet thought he was entitled to a raise, he would go to his supervisor at Redd. *Id.* at 234. If he wanted to take vacation time or call in sick, he would likewise have to report to Redd for that purpose. *Id.* at 235.

As is discussed below, there was considerable interaction between plaintiff and the railroad's personnel when the plaintiff serviced NRPC's railcars. However, it is obvious from the pest control specifications that coordination and cooperation between NRPC's employees and plaintiff would be necessary, given the frequency that pest control services were to be performed, that cars would be out of service for hours when they were fumigated and that the railroad needed to keep the railcars running on schedule. *See id.* Ex. A(2), Specifications. Mindful of the applicable legal standard, plaintiff characterizes the interaction between NRPC and himself as control by the railroad over his work, while NRPC labels the same facts as coordination and cooperation. The nature of the parties' interaction, as well as the other relevant facts, will be analyzed under the applicable authorities below.

### APPLICABLE TEST

The Fifth Circuit has repeatedly suggested nine factors that may be evaluated in determining whether the borrowed employee doctrine applies. Those factors are:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished the tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Melancon v. Amoco Production Co.,* 834 F.2d 1238, 1244 (5th Cir.), *reh'g denied,* 841 F.2d 572 (5th Cir.1988); *see also Capps v. N.L. Baroid–NL Industries, Inc.,* 784 F.2d 615, 616–617 (5th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 83 (1986), *West v. Kerr–McGee Corp.,* 765 F.2d 526, 530 (5th Cir.1985); *Alday v. Patterson Truck Line, Inc.,* 750 F.2d 375, 376 (5th Cir.1985); *Hall v. Diamond M Co.,* 732 F.2d 1246, 1249 (5th Cir.1984); *Gaudet v. Exxon,* 562 F.2d 351, 355 (5th Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). These factors will be analyzed in turn.

**Factor 1: Control.**

■ While the courts do not decide the issue of borrowed employee status based on any one of the foregoing factors, they place the most emphasis on the issue of control. *Melancon,* 834 F.2d at 1245; *see also Capps,* 784 F.2d at 617. To establish control, plaintiff must show that the railroad exercised a significant supervisory role over his work. The Fifth Circuit explained:

> The law does not require that the railroad have full supervisory control. It requires only that the railroad, through its employees, plays "a significant supervisory role" as to the work of the injured employee.

*Lindsey v. Louisville & Nashville Railroad Co.,* 775 F.2d 1322, 1324 (5th Cir.1985), *citing Kelley v. Southern Pacific Co.,* 419 U.S. 318, 327, 95 S.Ct. 472, 477, 42 L.Ed.2d 498 (1974). The test for requisite control has been further explained as requiring an evaluation of all the circumstances, but

> "the extent of the actual supervision exercised by a putative employer over the 'means and manner' of the workers' performance is the most important element to be considered in determining whether or not one is dealing with independent contractors or employees."

*North American Van Lines, Inc. v. National Labor Relations Board,* 869 F.2d 596, 599 (D.C.Cir.1989), *citing Local 777, Democratic Union Org. Comm., Seafarers Int'l Union v. NLRB,* 603 F.2d 862, 873 (D.C.Cir.1978). Global oversight is not sufficient to establish control. *Id.* Nor is cooperation and consultation in coordinated operations. *Kelley, supra,* at 326–327, 95 S.Ct. at 477–78.

■ Here, NRPC's contract with Redd required that Redd have technicians available 7 days a week, 24 hours of the day. NRPC Ex. D, Ancelet depo. at 34–35. NRPC was Redd's customer before Ancelet was hired. *Id.* at 34. Ancelet understood that NRPC was Redd's valuable client: "I was told that Amtrak [NRPC] is priority, high dollars. We would rather lose a restaurant than to lose the account like Amtrak." Ancelet Opposition Ex. A, Ancelet depo. at 207–08. Clearly, it was because Redd was obligated to provide extensive, on-call services to NRPC that plaintiff spent a substantial majority of his time on the railroad's premises. Even so, plaintiff admitted that he had to service 35 to 40 other customers of Redd's on a monthly basis. NRPC Ex. D, Ancelet depo. at 227–28.

Ancelet relies on the limited amount of on-site supervision by Redd personnel as evidence of control by NRPC. For example, Ancelet testified that a Redd supervisor was present at the NRPC facility approximately ten times in a year and a half. Ancelet Ex. A, Ancelet depo. at 300. However, Ancelet's Redd supervisor, Benedict Montalbano, testified that a lack of physical presence did not mean the technicians were not being supervised. First, the Redd technicians, including Ancelet, were licensed and experienced and did not require their supervisor to "look over their shoulder and make sure they were doing all right." NRPC Reply Ex. C, B. Montalbano depo. at 14–15. As Montalbano explained, "You can be supervised without having a shadow." *Id.* at 16–17.

Montalbano indicated that his review of a technician's paperwork and of the satisfaction of his customers permitted him to evaluate an employee's performance. *Id.* at 16. Further, the evidence reveals that Redd did not assign a supervisor to oversee Ancelet's work for other customers, and Redd did not typically assign supervisors to oversee the work of other Redd technicians as they serviced their routes. *See id.* at 16. Rather, Ted Bruesch, Manager of Technical Services, stated:

> "[O]nce a pest control technician employed by Copesan or an affiliate receives training and his state registration or license, he is given his own customer route, which he services alone or perhaps with a helper. A supervisor very rarely accompanies the technician on his route to 'look over the technician's shoulder' to make sure he is doing the job...."

NRPC Ex. A, T. Bruesch Affid. at ¶ 14. Moreover, plaintiff was expected to follow Redd's procedures in performing his job, and he was obligated to attend Redd meetings and to undergo Redd training. NRPC Reply Ex. D, D. Davis Depo. at 154–55; Ancelet Ex. A, Ancelet depo. at 300.

Ancelet argues that NRPC controlled the details of his work. As evidence, Ancelet states that he was told by the NRPC car foremen what time to report to the yard, the location and priority of the cars to be treated, the type of problem to be treated, and in some instances the type of treatment desired. Ancelet Opposition Ex. A, Ancelet depo. at 66–68. NRPC does not dispute that it was necessary for its car foremen to provide instructions to Ancelet as to the type of problems and cars involved. Further, Jon Reynier, an NRPC car foreman, testified that he did discuss treatment of various cars with Ancelet and would ask for shorter treatment procedures because of time constraints and a lack of railroad equipment. NRPC Ex. E, J. Reynier depo. at 50, 58–60. However, NRPC employees were not furnished copies of the NRPC pest control contract or the specifications and any subsequent changes. *Id.* at 52. Reynier further testified that, except for Vikane, he was not aware of the specific chemicals and techniques that Ancelet used to treat various pest control problems. *Id.* at 78–80. Plaintiff does not dispute that NRPC's concern in asking for particular procedures was because of the demanding schedule NRPC operated under to get the trains cleaned and serviced before the next morning. NRPC Reply Memo Ex. A, Ancelet depo. at 193.

Here, the nature of the pest control business required interaction between technician and customer, as well as some direction by the customer. Without such communication, the customer could not alert the technician to specific problems that the customer was experiencing. Moreover, NRPC was in the railroad business with a schedule to maintain. Given that fumigation of railcars could put the cars out of service for as much as six hours, there had to be coordination and cooperation between the railroad's personnel and plaintiff to get the cars treated and put back in service. Fairly read, the evidence indicates that NRPC's personnel made suggestions and at times gave instructions to use shorter versus longer pest control procedures when their equipment and scheduling needs required this.

Ancelet also testified that at times he would assist in preparing cars for treatment, a task that included removing food, trash, linens, and other items from cars. Ancelet Ex. A, Ancelet depo. at 203. Ancelet asserts that this is evidence that he routinely performed NRPC duties, reasoning that the specifications allocated this responsibility to NRPC, although Redd had the right to reject cars not properly prepared. NRPC Ex. A, T. Bruesch Affid. at ¶ 14 & Ex. A(2), Specifications. Ancelet testified repeatedly that Redd considered NRPC a priority account and that he was expected to keep this customer happy. It is hardly surprising that Ancelet often chose to cooperate and assist NRPC in preparing the cars for treatment. Ancelet's actions were nothing more than an accommodation to a valued customer. *See Robinson v. Baltimore & Ohio Railroad Co.*, 237 U.S. 84, 94, 35 S.Ct. 491, 494, 59 L.Ed. 849 (1915) (Pullman porter's responsibility for taking tickets or fares was mere accommodation, which did not make him railroad employee).

The evidence does not show that NRPC played a significant supervisory role over the means and manner of Ancelet's work. The Supreme Court in *Kelley, supra,* recognized the difference between control and "the passing of information and the accommodation that is obviously required in a large and necessarily coordinated operation." *Kelley,* 419 U.S. at 330, 95 S.Ct. at 479. In *Kelley,* the Court found that the railroad did not exercise significant supervisory control over an employee of a trucking company. The trucking company was primarily engaged in operations in conjunction with the defendant railroad, which was its parent company. The subsidiary was responsible for unloading automobiles from defendant's three-level flatcars. Even though the subsidiary maintained the operation on the railroad's yard on a permanent basis; the railroad inspected the cars for safety; railroad supervisors would from time-to-time advise or consult with the subsidiary's employees, and there were various other contacts between the railroad's employees and plaintiff about matters such as how long plaintiff's work would take, the Supreme Court found that plaintiff was not the railroad's borrowed employee. It noted that the activities of the two companies "were closely related and necessarily had to be coordinated." *Id.* at 326–27, 95 S.Ct. at 477. The Court found that the interaction between the railroad's personnel and plaintiff was not of a supervisory character but was the type of accommodation required in a large, necessarily coordinated operation. *Id.* at 327, 95 S.Ct. at 477. Here, as in *Kelley,* NRPC's operations required Ancelet to work closely with its personnel so that the railcars could be treated for pests while maintaining the schedule of the railroad. The evidence overwhelmingly reflects that Ancelet perform specialized services for NRPC in an operation that had to be coordinated with the railroad's regular activities. NRPC's actions did not rise to the level of control required to make Ancelet the NRPC's borrowed employee.

The cases cited by Ancelet in support of his argument that he is NRPC's borrowed employee are distinguishable. The court in *Lindsey v. Louisville & Nashville Railroad, supra,* affirmed a plaintiff's jury verdict because there was evidence that railroad employees gave directions as to the cars to be unloaded and issued specific orders and instructions to the contractor's personnel. Further, a railroad employee was the "boss" of the contractor's crew and inspected their work. The contractor's employees were permanently assigned to the railroad yard and never reported to the contractor's place of business even to collect their pay. *Id.* Finally, at the time of his injury, the *Lindsey* plaintiff was performing traditional railroad work, loading and unloading flatcars. Here, the "supervisory control" present in *Lindsey* is absent because Ancelet was not permanently assigned to NRPC's premises, was not performing traditional railroad work at the time of his injury and was not supervised by railroad personnel in performing his specialized services. Rather, Ancelet's interaction with railroad personnel was in the nature of cooperation and consultation.

Ancelet also argues that this case is factually similar to *Missouri–Kansas–Texas Railway Co. v. Hearson,* 422 F.2d 1037 (10th Cir.1970). The *Hearson* court upheld a trial court's finding that plaintiff, an employee of a car cleaning company, was an employee of the railroad for FELA purposes. The trial court found that the railroad's contract with the car cleaning company was a subterfuge to avoid the provisions of FELA. *Id.* at 1042. Plaintiff had been employed by the railroad for many years as a car cleaner when the railroad laid him off to contract car cleaning responsibility out to a new company. When plaintiff was hired by the new company, he "needed no instruction and went right to work cleaning the cars just as he had before the [railroad] laid him off. The only difference to him was that he had to furnish his own bar and hammer ... and that he was being paid by [the new company]." *Id.* at 1038–39. The record in *Hearson* was "replete with testimony to the effect that the railroad controlled the significant parts of the car-cleaning operation just as it did before it contracted with [the new company]" and that the railroad was simply trying to avoid FELA liability by contracting out the car cleaning service. *Id.* at 1042. Ancelet is correct that some of the factors considered

important in *Hearson* are present in his case, but there are significant differences. Ancelet had never been an employee of NRPC before being hired by Redd. There are no allegations that NRPC contracted with Redd in an attempt to avoid FELA liability. The railroad had never employed its own pest control technicians, and it is undisputed that pest control technicians must be licensed under state law.

Another case upon which Ancelet relies, *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344 (3d Cir.1991), is also distinguishable. In *Williamson*, the Third Circuit reinstated a jury verdict that plaintiff was an employee of a railroad at the time he was injured. *Id.* at 1354. Plaintiff was on the payroll of a wholly-owned subsidiary of the railroad. The railroad contracted with this subsidiary to handle loading and unloading at its terminal. *Id.* at 1347. As in *Hearson*, the *Williamson* court noted that the railroad had previously performed the operations now delegated to the subsidiary. Furthermore, the subsidiary shared office space with the railroad, and railroad clerks had the power to assign work to the subsidiary's employees and to change assignments given them by their supervisors. *Id.* at 1350. The court found that the evidence was sufficient to allow a reasonable jury to find that Williamson was subject to the railroad's control and direction when he was injured. *Id.* at 1352. Here, there is no evidence that the railroad was ever in the pest control business, nor is there evidence of an ownership link between Redd and NRPC.

For all of the foregoing reasons, there is no material fact issue that NRPC did not exercise the requisite control to make Ancelet its borrowed employee.

**Factor 2: Whose work was being performed?**

The evidence is clear that plaintiff was performing Redd's work as a pest control technician, not the work of the railroad. Redd's affiliate, Copesan, was issued a purchase order by NRPC to perform pest control services for NRPC facilities and railroad cars for the period of April 1, 1992 to March 31, 1994. NRPC Ex. A, T. Bruesch, Jr. Affid. at ¶ 4. This purchase order was in effect on October 5, 1993, the date of Ancelet's alleged accident. Furthermore, NRPC is not a licensed pest control operator in the State of Louisiana and does not employ any registered pest control technicians who could perform pest control work in Louisiana. NRPC Ex. B, R. Butler Affidavit at ¶¶ 3, 10. There is no question that Redd is in the business of pest control and that the work performed by Ancelet at the NRPC facility, was done on behalf of Redd to fulfill the contractual obligation of Copesan/Redd to NRPC. NRPC Ex. E, D. Davis depo. at 151–152. Thus, there is no material factual dispute that Ancelet was performing Redd's work, not the work of the railroad, when he provided pest control services at the NRPC facility.

**Factors 3 and 4: Was there an understanding between the original and the borrowing employer, and did the employee acquiesce in the new work situation?**

The relevant contractual arrangements all support NRPC's position that it hired Redd to supply pest control services, and that Redd in turn hired plaintiff to serve as its pest control technician. Ted Bruesch, Director of Technical Services for Copesan, testified that there was an "understanding between Copesan and the NRPC that the manpower necessary to provide the pest control services was to be furnished by, and subject to the control and supervision of, Copesan and its affiliates." NRPC Ex. A, Bruesch Affid. at ¶ 8. That understanding was evidenced by the pest control specifications, which required the pest control company to defend and indemnify NRPC for claims brought against the railroad for injuries to the contractor's employees arising out of their work and to obtain workers' compensation and employer's liability insurance. *Id.* Ex. A(1), Specifications. Further, the pest control company was required to provide the services of licensed pest control operators and to furnish all materials and equipment necessary to provide effective pest control service. *Id.* at Ex. A2.

Ancelet, on the other hand, had an employment contract with *Redd* obligating him to render pest control services exclusively for

Redd. The contract contains a noncompetition covenant, which specifies:

> Employee shall devote all of his time, attention, knowledge, and skills solely to the business and interest of employer, and employer shall be entitled to all of the benefits, profits or other issues arising from or incident to all work, services, and advice of employee, and employee shall not, during the term hereof, be interested directly or indirectly, in any manner, as partner, officer, director, stockholder, advisor, employee or in any other capacity in any other business similar to employer's business or any allied trade....

NRPC Ex. C(1), Employment Agreement at ¶ 5. At his deposition, Ancelet volunteered that he was presently employed by Redd. *Id.* Ex. D, Ancelet depo. at 5. He further testified that he serviced between 35 to 40 customers for Redd on a monthly basis. *Id.* at 228. It is true that the labels used in the parties' written agreements are not determinative when there is evidence of a contrary understanding. *E.g., Schroeder v. Pennsylvania Railroad Co.*, 397 F.2d 452, 455 (7th Cir.1968). However, here the terms of the agreements are consistent with the reality of the parties' relationships. All of the facts demonstrate that there was no understanding between NRPC and Redd that Ancelet was NRPC's borrowed servant.

### Factor 5: Whether the original employer terminated his relationship with the employee.

The evidence on this factor is overwhelming that Redd did not sever its relationship with Ancelet. As the court noted above, in response to a deposition question about whether he was employed, plaintiff volunteered, "Yes. With Redd Pest Control." *Id.* at 5; *see also id.* at 218–19 (admitting he had not been terminated). Ancelet drove a Redd truck, wore a Redd uniform, attended meetings at Redd, was paid by Redd, performed Redd's services with Redd's equipment, and consulted with Redd about sick leave, extra supplies, vacation time, expense reimbursement and raises. *Id. passim.* Clearly, Redd had not terminated its relationship with plaintiff.

### Factor 6: Tools and Place for Performance.

The place of performance was provided by NRPC. This fact, without more, does not determine the issue of plaintiff's status. Redd furnished its own registered technicians, equipment and supplies to service the railroad cars. *Id.* Ex. B, Butler Affid. at ¶ 18. Redd installed its own shed at the terminal yard where it stocked the chemicals and supplies used by its technicians. *Id.* Ex. E, D. Davis depo. at 131–132. The shed contained whatever equipment and tools that Ancelet needed to do his job. *Id.* Ex. D, Ancelet depo. at 222. David Davis of Redd testified that "anything that [was] needed to do a job at [NRPC] was in that building.... Everything belonged to Redd, the shed, the tools, the lock. The only thing [NRPC] owns is the ground it is setting on." *Id.* Ex. E, D. Davis depo. at 132. When Ancelet ran low on supplies or chemicals, he would contact Redd. *Id.* Ex. D, Ancelet depo. at 223. It is true that Ancelet sometimes borrowed flashlights, radios, small tools and electrical cables from NRPC, and he used the NRPC's large track fans instead of Redd's fans for aeration because they worked faster. Ancelet Ex. B, J. Reynier depo. at 39–42. However, it is clear that the principal equipment used in supplying pest control services was supplied by Redd and that what plaintiff borrowed from NRPC were incidentals. In addition, plaintiff admitted that he used a Redd truck for transportation. Given the mixed results under Factor No. 6, this factor is neutral in the Court's analysis.

### Factors 7, 8 and 9: Length of New Employment; Right to Discharge; Obligation to Pay.

Ancelet had serviced NRPC's account for approximately one and one-half years when he was injured. This factor is not probative one way or another, in light of the evidence of the nature of plaintiff's relationship with Redd.

As to the right to terminate, the evidence is clear that Redd, not NRPC, had the right to terminate Ancelet. Ancelet admitted that Redd had not terminated him. *See* NRPC Ex. D, Ancelet depo. at 5, 218–219. While Ancelet suggested that if NRPC were unhap-

py with him, this could negatively impact his retention, this does not amount to a right to terminate. Moreover, David Davis of Redd testified that Redd, not NRPC, had the right to terminate technicians. NRPC Ex. E, D. Davis depo. at 154–59. Roger Butler of NRPC indicated that NRPC had an entirely separate job application and hiring process and training program. NRPC Ex. B, Butler Affid. at ¶¶ 13 & 14. Clearly, Redd, not NRPC, had the right to terminate plaintiff.

Finally, as to Factor No. 9, there is no dispute that Ancelet was paid by Redd, not NRPC. *Id.* Ex. D, Ancelet depo. at 218–20.

## CONCLUSION

Summary judgment is an appropriate method for promptly disposing of actions in which there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). Material facts are those that will affect the outcome of the lawsuit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The material facts in this case are not in dispute. The Court finds that NRPC has met its burden to show that under the applicable law Ancelet is not its borrowed employee. Accordingly,

Defendant's Motion for Summary Judgment is **GRANTED.**