James D. **GEUSS**

v.

**PFIZER, INC., et al.**

**Civil Action No. 94–7059.**

United States District Court,
E.D. Pennsylvania.

Dec. 17, 1996.

Judith L. Jones, Easton, PA, Anne P. Felker, Bethlehem, PA, for plaintiff.

Linda S. Dwoskin, Dechert, Price & Rhoads, Philadelphia, PA, Kristine M. Derewicz, Buchanan Ingersoll Professional Corp., Pittsburgh, PA, Marguerite S. Walsh, Philadelphia, PA, Donald W. Schroeder, Harrisburg, PA, for defendants.

## OPINION

CAHN, Chief Judge.

### I. INTRODUCTION

Following a five day trial, a jury found that Defendants Pfizer, Inc., Quigley Co., and Minteq International, Inc. (collectively, "Pfizer") intentionally discriminated against Plaintiff James Geuss in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*[1] The jury awarded Geuss $65,000 in back pay, $89,000 in front pay, $11,250 in compensatory damages, and $150,000 in punitive damages.[2] Pfizer now seeks judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50, or, in the alternative, a new trial pursuant to Federal Rule of Civil Procedure 59.

### II. FACTS[3]

Plaintiff James Geuss was a laboratory technician who worked for Pfizer from June

---

1. 42 U.S.C. § 12112(a), which prohibits discrimination under the ADA, states:

 No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

2. The court submitted written interrogatories to the jury which asked:

 1. Has the plaintiff, James D. Geuss, proved by a preponderance of the evidence that his asthmatic condition substantially limits his ability to breathe?
 (If your answer is "No", return to the courtroom. If your answer is "Yes", proceed to answer question 2.)
 2. Has plaintiff proved by a preponderance of the evidence that the defendants intentionally discriminated against him as an employee because of his asthmatic condition?
 (If your answer is "No", return to the courtroom. If your answer is "Yes", proceed to answer question 3.)
 3. State in dollars the amount of damages James D. Geuss has proved for:
 (a) Back pay
 (b) Front pay
 (c) Emotional damage
 4. State in dollars the amount of punitive damages, if any, you award for malicious and/or reckless disregard of plaintiff's rights as a disabled employee.

3. The following is a brief description of the events leading up to the jury's verdict. Additional facts will be discussed as needed throughout the opinion. "Because we are required to give

1989 to October 1992. As a laboratory technician, he was involved with batching, blending, mixing, casting, cutting, drying, and testing substances that were used in the manufacture of refractory materials. His job also consisted of administrative tasks such as completing paperwork and entering data into a computer. Employees of Pfizer knew Geuss had asthma, but he was able to perform his job without incident until the fall of 1991.

During the fall of 1991, Geuss' supervisor changed from Richard Griffin to Amy Hale. Hale assigned Geuss more laboratory duties and less administrative work. Geuss' asthma attacks increased once he began working for Hale. Geuss and employees of Pfizer had several discussions beginning in early 1992 concerning the extent of Geuss' asthma and whether any accommodations could be made. The parties did not agree on a solution to Geuss' problem. On or around October 5, 1992, Geuss began staying home from work because his doctor, Dr. Eric Schenkel, recommended that he stay at home until he felt better. Pfizer concluded there was nothing more it could do for Geuss and told him to report to work on October 26, 1992, or be suspended without pay. On October 26, Geuss reported to work with a note from Dr. Schenkel that stated Geuss could not work because the work environment exacerbated his asthma. Pfizer suspended Geuss without pay beginning on October 26, 1992, but he continued to receive medical benefits until April 1993. Geuss filed his disability discrimination claim with the Equal Employment Opportunity Commission ("EEOC") on October 29, 1992, and this case was tried in May 1996.[4]

### III. *LEGAL STANDARD*

A motion for judgment as a matter of law "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is

insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993) (citation omitted).

In cases where a party is requesting a new trial based upon the weight of the evidence, a district court should grant a new trial only if "a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3d Cir.1991). "[T]his stringent standard is necessary to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of facts." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1075–76 (3d Cir.1996) (en banc) (internal quotation marks omitted). "A court may also grant a new trial if the verdict was the result of erroneous jury instructions, was excessive or clearly unsupported by the evidence, or was influenced by extraneous matters such as passion, prejudice, sympathy or speculation." *Rush v. Scott Specialty Gases, Inc.*, 930 F.Supp. 194, 197 (E.D.Pa. 1996) (citations omitted).

Defendants make a myriad of arguments in support of its motions. Essentially Defendants argue:

(1) Geuss is not disabled;

(2) Even if he is disabled, he is not a qualified individual with a disability under the ADA;

(3) Geuss never requested a specific, reasonable accommodation;

(4) Even if discrimination occurred, the damages the jury awarded were excessive; and,

---

deference to the jury's finding of liability, in this opinion we will present primarily the plaintiff's account of events to the extent evidence in the record supports it." *Hurley v. Atlantic City Police Dept.*, 933 F.Supp. 396, 404 n. 4 (D.N.J. 1996).

4. Although Plaintiff filed this case under the ADA and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.*, neither party has pursued any issues on appeal that require this court's analysis of the PHRA.

(5) The court made errors in the admission of evidence and in the jury instructions.

The court will address each of these arguments in turn.

## IV. DISCUSSION

### A. GEUSS' DISABILITY

■ The jury specifically found that Geuss' asthmatic condition substantially limited his ability to breathe. (Jury Interrog. No. 1). Pfizer takes issue with this finding, arguing that Geuss failed to prove he is disabled. In support of its position, Pfizer submits that Geuss provided insufficient evidence that his impairment substantially limited his ability to work or breathe, and that Geuss cannot be found disabled because he only provided subjective evidence of his disability. The court rejects Defendants' arguments.

For the purposes of the ADA, "disability" means:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or,

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Only the first prong of the definition is at issue in this case. "[A]n individual is substantially limited in a major life activity if he is '[u]nable to perform a major life activity that the average person in the general population can perform' or is '[s]ignificantly restricted as to the condition, manner or duration under which [he] can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.'" *Kelly v. Drexel Univ.,*

94 F.3d 102, 105 (3d Cir.1996), *quoting* 29 C.F.R. § 1630.2(j). Major life activities include breathing and working. 29 C.F.R. § 1630.2(i).

"The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices." 29 C.F.R. Pt. 1630, App. § 1630.2(h). In this case, Dr. Schenkel testified that Geuss had moderately severe asthma. It is difficult to determine the full extent of Geuss' impairment without medication because he has taken medication for his asthma on a daily basis for as long as he can remember. There is also no suggestion in the record that there ever will be a time when Geuss will be able to live without asthma medication. Geuss testified what happened when his medication was unavailable:

> And, I ended up getting an asthma attack and we had to drive a great distance. By the end of the drive home, I was wheezing so badly that I was on the verge of passing out. Suzanne—I didn't even get out of the car. Suzanne ran into the house, grabbed the asthma medicine and I had an oxygen tank at that time and she gave me my medicine and I took my oxygen and I finally came around.

(Trial Tr. 5/7, 65–66). Geuss testified that he had 1–2 asthma attacks a day in the week before the trial and this frequency of attacks was fairly typical.[5] (Trial Tr. 5/7, 60–61). Even minor instances of physical exertion, such as running approximately 100 feet to his young son who had skinned his knee, have triggered asthma attacks. (Trial Tr. 5/7, 56–57). His difficulty in breathing forces him to avoid certain pets, cigarette smoke, perfume, and fresh paint, and his house is cleaned about three times a week so dust does not accumulate. (Trial Tr. 5/8, 27–32). All of

---

5. Geuss described what it was like to endure an asthma attack:

> [S]ometimes it can be very severe like someone is putting a scarf over your mouth and you cannot get enough air into your mouth to breathe. No matter how hard your lungs labor, you cannot get enough air down inside. It feels like there's a heavy weight on your chest pressing you down. It feels like somebody is pinching you on the sides of your chest. And, in situations like that, I experience dizzi-

ness, blurred vision, sometimes headaches.... If the attacks continue for a long time, my lungs get a raw feeling to them just as if someone had stuck a bottle brush down your lungs and was, you know, just making hamburger out of the inside of your lungs. It's a very raw, achy feeling ... that doesn't go away in an hour or two hours. It may last for several days.

(Trial Tr. 5/7, 55).

these limitations have been present throughout Geuss' life even though he takes medication daily.

Pfizer relies primarily on two cases, *Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir.1996), and *Heilweil v. Mount Sinai Hospital*, 32 F.3d 718 (2d Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995), to support its claim that Geuss is not disabled.

In *Kelly*, the Court of Appeals for the Third Circuit affirmed the grant of summary judgment against the plaintiff on the ground that he was not disabled under the ADA. While *Kelly* discussed the issue of whether the plaintiff was substantially limited in the life activity of walking, the case at bar involves whether Geuss is substantially limited in the life activity of breathing. Thus, while the fact that Geuss generally walked (an unspecified distance) to and from work for a period of two years might be strong evidence that Geuss is not substantially limited in the life activity of walking (as it was in *Kelly* ), it is not nearly as persuasive in determining whether Geuss is substantially limited in the life activity of breathing. Furthermore, unlike Geuss, who requires daily asthma medication, the plaintiff in *Kelly* did not require any special devices like a cane or crutches. *Kelly*, 94 F.3d at 106. Finally, for ADA purposes, Geuss' disability is evaluated without regard to mitigating measures such as his medication. 29 C.F.R. Pt. 1630, App. § 1630.2(h).

■ *Heilweil* was a Rehabilitation Act case[6] in which the Second Circuit Court of Appeals affirmed summary judgment against an asthmatic hospital laboratory worker. The court found that Heilweil was not sub-

stantially limited in the life activity of breathing because she felt "fine" after not being at her job for several months, and because her respiratory condition did not limit her ability to exercise. *Heilweil*, 32 F.3d at 723. However, whether or not an employee felt "fine" months after working at a particular job is not dispositive in determining whether a person was substantially limited in the major life activity of breathing at the time of the adverse employment decision. In addition, in contrast to Heilweil, who was not limited in her ability to exercise, Geuss testified that while he could hit a volleyball over a net or throw a football, he has never played a full game. (Trial Tr. 5/8, 66–67). Even running down a short driveway to pick up his son was enough to trigger an asthma attack. (Trial Tr. 5/8, 66).

The issue of whether Geuss is substantially limited in the major life activity of breathing is admittedly a close one. However, the evidence in the record is sufficient to show that Geuss' ability to breathe is significantly restricted in condition, manner, and duration in comparison to the average person in the population. Thus, this court will not reject the jury's specific finding that Geuss' asthmatic condition substantially limits his ability to breathe.

■ Pfizer also argues that Geuss is not disabled because he has not shown how his asthma impairs his ability to work. Defendants' argument is without merit. The EEOC Compliance Manual clearly states that if a person is substantially limited in a major life activity other than working, then no analysis of the impairment's impact on the person's work is needed.[7] Other courts that

**6.** Cases decided under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, can provide a useful guide in interpreting the ADA because Congress relied heavily on the Rehabilitation Act when drafting the ADA. *Mobley v. Board of Regents of the Univ. System of Georgia*, 924 F.Supp. 1179, 1185 (S.D.Ga.1996).

**7.** *See Kelly*, 94 F.3d at 106:

> The EEOC Compliance Manual notes that most ADA complaints involve questions about an individual's ability to work but the manual recognizes that this ability need not be an issue. The manual points out, for instance,

that 'if an individual's arthritis makes it unusually difficult … to walk, then the individual is substantially limited in the ability to walk … [and] one would not need to ascertain whether the individual is also substantially limited in working.'

(citation omitted). *See also* 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("If an individual is not substantially limited with respect to any other major life activity, the individual's ability to perform the major life activity of working should be considered. If an individual is substantially limited in any other major life activity, no determination should be made as to whether the individual is substantially limited in working.").

have faced this issue have not required a plaintiff to show an adverse impact on his work in order to be considered disabled under the ADA. *See, e.g., Doe v. Kohn Nast & Graf P.C.,* 862 F.Supp. 1310, 1320 (E.D.Pa. 1994); *Bell v. Elmhurst Chicago Stone Co.,* 919 F.Supp. 308, 309 (N.D.Ill.1996). Since I have found that the evidence supports the jury's verdict that Geuss is substantially limited in the life activity of breathing, there is no need to analyze the impact Geuss' asthma had on his work.

Pfizer next argues that subjective evidence alone cannot support a finding of disability. Defendants compare this case to that of *Mobley v. Board of Regents of the Univ. System of Georgia,* 924 F.Supp. 1179 (S.D.Ga.1996), in which summary judgment was granted against the plaintiff in an ADA case. According to Pfizer, both *Mobley* and the instant action involve situations where doctors' notes and the plaintiff's subjective testimony were the sole basis of the plaintiff's disability claims. Defendants' reliance on *Mobley* is misplaced. *Mobley's* discussion of the inadequacy of the doctor's notes was made in regard to the second prong of the disability definition—establishing a record of impairment.[8] *Id.* at 1187–88. As discussed earlier, the "record of impairment" prong of the ADA definition of disability is not at issue in the case at bar.

The other two cases relied on by Pfizer, *Maulding v. Sullivan,* 961 F.2d 694 (8th Cir.1992), *cert. denied sub. nom, Maulding v. Shalala,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993), and *Harmer v. Virginia Electric & Power Co.,* 831 F.Supp. 1300 (E.D.Va.1993), also cannot be read to support Defendants' sweeping assertion that as a matter of law, subjective evidence, by itself, cannot support a finding of disability.[9]

Moreover, as Dr. Schenkel testified, "[A]sthma is many times a clinical diagnosis, meaning it's after you talk to a patient. Many tests can be completely normal." (Trial Tr. 5/9, 46). Dr. Schenkel did not conduct a test that could have shown the effect the chemicals had on Geuss' asthma because Dr. Schenkel felt the test was potentially dangerous. (Trial Tr. 5/9, 42). Geuss' peak flow test results showed that there was a dramatic decrease in Geuss' lung capacity while he was at work, (Trial Tr. 5/9, 10) and even Pfizer's medical expert had no reason to think Geuss was misrepresenting the extent of his asthma. (Trial Tr. 5/15, 77). Geuss' credibility was for the jury to assess. Thus, as was discussed earlier, the court finds there was sufficient evidence to support the jury's conclusion that Geuss was disabled.

**B. QUALIFIED INDIVIDUAL WITH A DISABILITY**

■ Pfizer argues that Geuss is not a qualified individual with a disability. A qualified individual with a disability is an individual who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."[10] 42 U.S.C. § 12111(8). In this case, it is uncontested that performing laboratory work was an es-

---

8. The court in *Mobley* did find that the plaintiff did not present sufficient evidence to satisfy the "substantial limitation" prong of the statute. However, the court's discussion of the "substantial limitation" prong gave no suggestion that a plaintiff must present objective evidence in order for there to be a finding of disability.

9. *Maulding* affirmed the grant of summary judgment in favor of the employer because the court found the plaintiff did not present sufficient evidence of disability. *Maulding* did not require a plaintiff to present objective medical evidence in order for there to be a disability finding. The court in *Harmer* assumed the plaintiff was disabled so, as Pfizer acknowledges, the court's discussion centered solely around whether the defendant provided the plaintiff with reasonable accommodation.

10. Factors to consider in determining whether a particular function is essential include: whether the position exists to perform a particular function; whether a number of other employees are available to perform that job function; the degree of skill or expertise required to perform the function; written job descriptions that are prepared before advertising or interviewing applicants for the job, as well as the employer's judgment as to what functions are essential; the work experience of past employees of the job or of current employees in similar jobs; the time spent performing the particular function; and, the consequences of failing to require the employee to perform the function. 29 C.F.R. Pt. 1630, App. § 1630.2(n).

sential function of Geuss' position. The dispute between the parties involves the percentage of time that Geuss was expected to do lab work.

Pfizer claims that Amy Hale, who became Geuss' supervisor in the fall of 1991, met with him in January 1992 to tell him that she expected him to do approximately 85% lab work and 15% administrative work. (Trial Tr. 5/14, 222–24). While working under his prior supervisor, Peter Griffin, Geuss spent only 30%–50% of his time on lab work. (Trial Tr. 5/7, 113).

Geuss contends that Pfizer did not inform him of the 85% lab work requirement until an October 15, 1992 meeting between the parties. (Trial Tr. 5/8, 58–59). At this meeting, Geuss was shown a written job description with the 85% lab work requirement. (*Id.*). Geuss claims Pfizer made up the job description requiring 85% lab work as a way to disqualify him, while the real job description for Geuss' position, which Geuss introduced at trial, contained no such requirement.[11] The evidence is uncontradicted that Geuss performed in a satisfactory manner during the period in which he spent 30%–50% of his time doing laboratory work for Richard Griffin. Given the conflicting evidence regarding the percentage of lab work Geuss was expected to perform, and given the fact that the jury specifically found that Pfizer intentionally discriminated against Geuss because of his asthmatic condition, (Jury Interrog. No. 2), the court cannot conclude that the jury erred in rejecting Pfizer's claim that 85% laboratory work was essential to Geuss' position. The court finds that based on Geuss' satisfactory performance while working under Griffin, it was for the jury to decide if Geuss was qualified to fulfill the essential functions of being a lab technician at Pfizer.[12]

## C. *REASONABLE ACCOMMODATION*

Geuss was required to request a reasonable accommodation that would enable him to perform the essential functions of his job. The court's written instructions to the jury stated:

> [I]t is Mr. Geuss's burden to prove that the accommodation he suggests would be effective (that is, that the accommodation would enable him to do his job or that another job with the defendant for which plaintiff is qualified, with or without ac-

11. Defendants argue that the court erred in admitting the job descriptions submitted by Geuss on the grounds that the documents were not properly authenticated and were hearsay. The Court of Appeals for the Third Circuit has ruled that "[t]he burden of proof for authentication is slight. 'All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be.'" *Link v. Mercedes-Benz of North America*, 788 F.2d 918, 927 (3d Cir.1986), *quoting McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir.1985) (further citations omitted). "Once a prima facie [showing of authenticity] is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Link*, 788 F.2d at 928, *quoting United States v. Goichman*, 547 F.2d 778, 784 (3d Cir.1976). The documents at issue were presented through the testimony of a former employee of Defendants, who testified that he received these job descriptions in 1993 during the course of his employment. (Trial Tr. 5/15, 105–107). In addition, Hale testified that other, more general job descriptions did exist that applied to lab technicians and assistants. (Trial Tr. 5/15, 10). Finally, the documents themselves appear to be what Geuss claims them to be—job descriptions for different lab technician levels at Pfizer's labora-

tory. Pfizer "simply [has] not produced any evidence or forwarded any reason to impeach the validity of the documents." *United States v. Stelmokas*, 100 F.3d 302, 312–13 (3d Cir.1996). Since it is a reasonable inference that the descriptions were created by employees of the Defendants within the scope of their employment, the descriptions are not hearsay, but are admissions by a party opponent. Fed.R.Evid. 801(d).

12. Pfizer also argues that Geuss' doctor concluded that Geuss could not work in the lab so Geuss could not perform the essential functions of his position. As a result, Pfizer claims Geuss could not be considered "qualified." *See* Defendants' Exhibit 27 (letter from Dr. Schenkel to Jeanette Brizel, Personnel Manager, September 25, 1992). However, as will be discussed in the next section, Geuss contends Defendants failed to provide him with a reasonable accommodation. The court finds that Schenkel wrote his September 25 letter only after it became apparent that Defendants were not willing to provide an accommodation satisfactory to Geuss and his doctor. Without such an accommodation, it was for the jury to decide if Dr. Schenkel was reasonable in concluding that Geuss' asthma precluded Geuss from working in the lab if he had to continue doing 85% laboratory work.

commodation, is available).... If you find that Mr. Geuss has met this part of his burden, then the Pfizer defendants may still prevail if they prove by a preponderance of the evidence that the accommodation or accommodations which Mr. Geuss proposes would be an undue hardship or unreasonable.

Defendants object to the instruction, saying Plaintiff has the burden of proof on all issues, including whether the accommodations suggested by Geuss would cause undue hardship or be unreasonable.

■■■■ The court's jury instruction followed the holding in *Borkowski v. Valley Central School Dist.*, 63 F.3d 131, 138 (2d Cir.1995), which held that after the plaintiff has made a prima facie showing that a reasonable accommodation is available, the employer has the burden to prove that the suggested accommodation would cause undue hardship or be unreasonable. *See id.* ("At this point the defendant's burden of persuading the factfinder that the plaintiff's proposed accommodation is unreasonable merges, in effect, with its burden of showing, as an affirmative defense, that the proposed accommodation would cause it to suffer an undue hardship."). Since the trial of the present action, the Court of Appeals for the Third Circuit has followed *Borkowski*'s holding in the context of the Rehabilitation Act. *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir.1996) ("The plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer."). This court concludes that its jury instruction on reasonable accommodation was not in error.[13]

Geuss asserts that his request for a transfer back to his prior supervisor, Richard Griffin, was an effective, reasonable accommodation. Defendants make three arguments in regard to transfer:

(1) The court erred in not including Defendants' requested jury instruction;

(2) Geuss failed to demonstrate that there was no accommodation available that would allow him to perform adequately in his current position so there was no duty to consider transfer as a reasonable accommodation; and,

(3) There were no open positions for which Geuss was qualified.

■■■ Defendants contend that the court should have instructed the jury that an employer has no duty under the ADA to consider transfer to a different company as a possible means of reasonable accommodation. Given the extremely close relationship between the Defendants, the court finds that its instruction was not in error.[14] The cases cited by Defendants support the proposition that an employer is required to offer transfer to another facility when there is a practice of the employer doing so. *Riley v. Weyerhaeuser*, 898 F.Supp. 324, 329 (W.D.N.C.1995);

**13.** Defendants also claim the court erred in telling the jury that once a plaintiff is found disabled, the law puts a duty on the employer to start a reasonable accommodation process. Defendants do not contend that they suffered any prejudice as a result of this statement. In any event, the court repeatedly instructed the jury that Geuss must suggest an accommodation that would be effective in enabling him to do his job. *See, e.g.*, Trial Tr. 5/15, 192–93:

The ADA does not require an employer to guess at the actions it should take to provide a reasonable accommodation to an employee. It is not enough for the employee to make vague suggestions or references in this regard. Rather, it's the employee's responsibility to come forward and tell the employer specifically what he or she needs to be able to perform the job. Thus, if you determine that Mr. Geuss failed to request reasonable accommodations of a spe-

cific nature, then you may find that the defendants are not liable.

Defendants' objection to the statement that an employer has a duty to pursue reasonable accommodations is not enough to merit the granting of a new trial, especially since the court made it clear that Geuss had the burden of coming forward with a specific, feasible accommodation.

**14.** Until 1992, Pfizer owned both Quigley and Specialty Minerals. Quigley was the predecessor of Minteq. In 1992, Pfizer divested itself of Specialty Minerals and Minteq. At that time, a holding company, Minerals Technologies, was created to own Minteq and Specialty Minerals. (Trial Tr. 5/9, 191–92, 195). The parties agreed during the trial to make no distinctions among the various corporate entities.

*Emrick v. Libbey–Owens–Ford Co.,* 875 F.Supp. 393, 398 (E.D.Tex.1995); *see also Gile v. United Airlines, Inc.,* 95 F.3d 492, 498 (7th Cir.1996) ("[B]y discussing reassignment to different offices and facilities, the EEOC's guidance implies that reasonable accommodation may also include reassignment outside of the particular department, office, or facility in which the employee previously worked."). In the instant action, there was sufficient evidence of employees transferring between subsidiary companies. Moreover, according to Pfizer's personnel manager Jeanette Brizel, employees who applied for a job opening in another subsidiary were considered internal rather than external candidates. (Trial Tr. 5/14, 150). As a result, there was no error in the court's jury instruction.

Defendants then claim that even before the issue of transfer can arise, the employee must first demonstrate that no reasonable accommodation exists that would allow the employee to perform his current position. However, neither the statute nor the case law clearly delineates which party has the burden of demonstrating that no other alternative exists except for transfer. *See* 42 U.S.C. § 12111(9); *Gile,* 95 F.3d at 498 ("[A]n employer may be obligated to reassign a disabled employee only when, even with reasonable accommodation, the employee can no longer perform the essential functions of his present job."); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(*o*) ("In general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship.").

Geuss contends he requested a number of specific, reasonable accommodations, includ-

ing transferring to a different position, retraining, changing job duties, improving the ventilation in the laboratory, and using a self-contained breathing apparatus.[15] (Trial Tr. 5/8, 137–140). Pfizer claims that Geuss never specifically requested any accommodations and even if he did, none of these accommodations was reasonable. Both parties presented conflicting evidence concerning the feasibility of Geuss' requests. It was for the jury to decide if Geuss requested a specific, reasonable accommodation that would have enabled him to carry out the essential functions of his position. However, no such accommodation was made, and Dr. Schenkel provided the jury with sufficient evidence of Geuss' inability to continue working as Amy Hale's lab assistant.[16] As a result, the court must determine if there was sufficient evidence for the jury to conclude that Geuss' request to be transferred back to Richard Griffin was an effective, reasonable accommodation.

■ The court instructed the jury that in order for a transfer to be a reasonable accommodation, "Mr. Geuss must prove that that position was open, available, and that he was qualified to do it." (Trial Tr. 5/15, 198). During the trial, Geuss testified that Richard Griffin needed a lab technician. (Trial Tr. 5/7, 220). Geuss asked if he could go back and work for Griffin, but the transfer never occurred. (*Id.*). Although Geuss could not remember the exact date of his conversation with Griffin, the testimony does establish that Geuss had this conversation during the time he worked for Hale. According to Geuss, an outside agency hired a temporary worker to fill the position. (Trial Tr. 5/7, 221). Defendants did not effectively refute this testimony. The evidence also showed

---

**15.** Pfizer claims the court prejudiced it by telling the jury that Geuss suggested five proposals as possible accommodations. The court told the jury, "You must evaluate whether plaintiff's proposals are effective and reasonable. I noticed that he has five proposals. I recollect five, but this is up to you.... So I remember five possible accommodations that the plaintiff has suggested. There may be more, or perhaps you don't agree with me that there are five, and you may find there were less. That's your decision." (Trial 5/15, 189–90). The transcript makes it quite clear that the court informed the jury that it had full discretion to decide whether Geuss spe-

cifically requested any accommodations so the court's comments were not prejudicial.

**16.** Dr. Schenkel's letters of September 25, 1992 and October 22, 1992 discuss Geuss' inability to work as Hale's lab assistant due to the effect on his asthma. Defendants argue that Dr. Schenkel did not have sufficient information to make this determination. The jury heard conflicting testimony from Dr. Schenkel and Defendants' witnesses about the effect that Pfizer's workplace had on Geuss' asthma. The jury apparently was persuaded by Dr. Schenkel's testimony, and I find no reason to disturb that conclusion.

that Geuss performed competently while he worked for Griffin, who required Geuss to perform laboratory work 30–50% of the time.[17] Consequently, Plaintiff has met his evidentiary burden to show that a transfer back to Griffin could have been an effective, reasonable accommodation.[18]

An employer is not required to provide an accommodation that would impose an undue hardship on the operation of the employer's business. 29 C.F.R. Pt. 1630, App. § 1630.2(p). "The term 'undue hardship' means significant difficulty or expense in, or resulting from, the provision of the accommodation." *Id.* In this case, while Pfizer did present evidence that it would not be feasible to reduce Geuss' laboratory duties while remaining as Hale's lab assistant, it did not present any evidence that transferring Geuss back to Griffin would be an undue hardship on Pfizer.

 Pfizer also contends that Geuss was responsible for the breakdown in the interactive process so it should not be held liable for failure to provide reasonable accommodation. Pfizer's primary claim in support of its argument is that as of November 2, 1992, Geuss had a written offer to be put on paid leave if he would authorize his doctor to speak with Pfizer's doctor. Geuss responds that Pfizer never engaged in any process that could be termed "interactive" as contemplated by the ADA.

> [C]ourts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interac-

tive process is not acting in good faith. . . . In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Beck,* 75 F.3d at 1135. Bad faith in the interactive process suggests discriminatory animus. *Valentine v. American Home Shield Corp.,* 939 F.Supp. 1376, 1401–02 (N.D.Iowa 1996).

In the instant action, Geuss introduced sufficient evidence that Pfizer did not put forth a good faith effort to engage in the interactive process. Geuss testified that employees of Pfizer repeatedly told him there was nothing they could do to help him. *See,* e.g., Trial Tr. 5/8, 49 ("I remember that I was told by Jeanette [Brizel] in February [1992] that—January, February, something like that, that there was nothing that the company could do for me. And I was told by Amy [Hale] in April [1992] that there was nothing the company could do for me. . . . "). In addition, Al Valenia, a vocational rehabilitation counselor who worked for the Office of Vocational Rehabilitation, (an agency of the Commonwealth of Pennsylvania), testified that he asked Gregory Daum, then Pfizer's director of environmental health and safety, if he (Valenia) could observe where Geuss worked so he could "get a better handle on what's going on." (Trial Tr. 5/8, 173–74). According to Valenia, Daum flatly refused his request, saying there was no problem. (Trial Tr. 5/8, 174).

Thus, there was sufficient evidence for a jury to conclude that long before the November 2, 1992 letter to Geuss, Pfizer had repeatedly stymied Geuss in his attempt to get Pfizer to provide reasonable accommodation.[19] Hence, Pfizer cannot escape liability

---

17. Defendants argue that the effectiveness of the accommodation may not be based solely on Plaintiff's subjective belief. In this case, there was sufficient evidence beyond Geuss' own opinion that he could do the work required by Griffin. This evidence included Geuss' performance reviews in 1989 and 1990 as well as Griffin's testimony. (Trial Tr. 5/9, 87–89).

18. It must be emphasized that at this stage in the process, a plaintiff only has to make a prima facie showing that he has suggested a reasonable accommodation. Once a plaintiff has made such a showing, the ADA contemplates an interactive process between the parties in which both sides

work together in identifying reasonable accommodations that can overcome plaintiff's limitations. *Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996).

19. It is true, however, that Daum had requested Geuss' medical records on July 15, 1992. Dr. Schenkel responded to Daum's request on July 17, 1992 and August 7, 1992 with letters that described Geuss' condition. The August 7 letter stated in part that the connection between Geuss' asthma and his workplace "has been documented on both clinical grounds, as well as by him following pulmonary function capacity at home and at work. This data can be supplied to you if

by claiming Geuss was responsible for the breakdown in the interactive process.

## D. EXCESSIVE DAMAGES

Pfizer does not appeal the amount of damages the jury awarded with respect to compensatory damages and back pay. However, it argues that no front pay should have been awarded because Geuss refused an offer of reinstatement. Pfizer also vigorously contends that punitive damages are unwarranted.

### 1. FRONT PAY

■ Pfizer's reinstatement argument fails because the alleged offer of reinstatement occurred during a pre-trial mediation conference. Local Rule 53.2.1.5(e) of the Eastern District of Pennsylvania explicitly states:

> [N]othing communicated during the mediation process (including any oral or written statement made by a party, attorney or other participant ... ) shall be placed in evidence, made known to the trial court or jury, or construed for any purpose as an admission. No party shall be bound by anything done or said during the mediation process....

Defendants' attempt to use the mediation proceedings as a way to avoid liability for front pay is completely without merit. In addition, Geuss testified that Pfizer never made him an unconditional offer of reinstatement. (Trial Tr. 5/8, 24–25).

### 2. PUNITIVE DAMAGES

Punitive damages are awarded to punish the defendant for outrageous conduct and deter it and others like it from similar conduct in the future. *Smith v. Wade*, 461 U.S. 30, 54, 103 S.Ct. 1625, 1639, 75 L.Ed.2d 632 (1983). Punitive damages may be awarded if Pfizer acted with malice or reckless indifference to Geuss' federally protected rights. 42 U.S.C. § 1981a(b)(1). Pfizer argues that the evidence was insufficient to support a finding of punitive damages. In the alternative, Pfizer requests a remittitur of the jury's $150,000 punitive damages award.

■ This court finds that there is sufficient evidence to support the jury's conclusion that punitive damages are warranted. The two primary pieces of evidence supporting the jury's finding are the air quality test that Pfizer contracted to have done in its lab and Dr. Richard Schusterman's report of his examination of Geuss.

Pfizer ·hired Clayton Environmental Consultants to conduct a dust study in Pfizer's lab purportedly to see if there was any link between Geuss' health problems and the air quality in the lab. Geuss testified that the lab floor was professionally cleaned the night before the air quality study. A fire door and windows, which were normally kept shut, were open while the tests were conducted. In addition, Geuss testified that even before Clayton had conducted the air quality test, Gregory Daum told Geuss that the test results would show that the lab was not the cause of any problems with Geuss' asthma. The totality of this testimony could lead a reasonable jury to conclude that Pfizer staged the air quality test to reach a predetermined result.

In response to Geuss' complaints about his asthma, Pfizer sent Geuss to Dr. Shusterman to be examined. Dr. Shusterman concluded that Geuss did not have occupationally induced asthma. (Trial Tr. 5/15, 37). On cross-examination, however, it was revealed that several changes were made from Dr. Shusterman's draft report to his final report. Statements in the draft report such as, "[I]t remains unclear as to the etiology of his complaint of increased asthma exacerbations over the last three years," (Trial Tr. 5/15, 53) and "There remains a question as to whether the work environment is serving as a symptom-exacerbating factor for a preexisting condition," (Trial Tr. 5/15, 59) were not included in the final report. Given these changes between the draft and final report, a jury could reasonably conclude that Dr. Shusterman's report was changed so that the workplace would not be seen as exacerbating Geuss' asthma. Consequently, there is suffi-

requested." Dr. Schenkel testified that he did not recall if the Defendants ever contacted him to

request this data. (Trial Tr. 5/9, 23–24).

cient evidence to support the jury's findings that punitive damages are warranted.

The court must also decide whether to grant a remittitur.

> [W]here the verdict is so large as to shock the conscience of the court, the appropriate action for the court is to order plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence or, if the remittitur [is] refused, to submit to a new trial.[20]

*Dunn v. HOVIC,* 1 F.3d 1371, 1383 (3d Cir.) (en banc) (internal quotation marks omitted), *cert. denied,* 510 U.S. 1031, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993). The Supreme Court has recently articulated three guideposts to aid a court in determining whether a particular punitive damage award is excessive.[21] *BMW of North America, Inc. v. Gore,* — U.S. —, — — —, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996). These guideposts are: the degree of reprehensibility of defendant's conduct, the disparity between the actual or potential harm suffered and the punitive damage award, and the difference between the award and the civil or criminal penalties that could be imposed in comparable cases. *Id.*

### a. DEGREE OF REPREHENSIBILITY

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW,* — U.S. at —, 116 S.Ct. at 1599. In the case at bar, Pfizer did take a number of actions which appear to be inconsistent with a company acting with malice or reckless indifference to Geuss' rights. For instance, it is undisputed that employees of Pfizer knew Geuss had asthma when he was hired in 1989; he was allowed to lie down when he was having breathing difficulties; Pfizer offered to place Geuss on leave with pay if he would authorize

a dialogue between the doctors; and, even though he was suspended without pay on October 26, 1992, Geuss continued to receive medical and dental benefits until April 1993.

A comparison with other employment discrimination cases in which $150,000 or more in punitive damages was awarded reveals that the defendants' conduct in those instances was far more reprehensible than was the situation here. In these other cases, courts found that supervisory personnel turned a blind eye to the misconduct of subordinates, actively participated in the discriminatory conduct, or the defendant exhibited a propensity to engage in future violations. For instance, in *U.S. EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276 (7th Cir.1995), the court held that $150,000 in punitive damages was not excessive in a situation where the defendant discharged an employee who had terminal brain cancer but was working full-time. The district court in *AIC Security* also noted that the defendant's testimony could reasonably have led the jury to "infer a lack of remorse and a likelihood of future violations." *U.S. EEOC v. AIC Security Investigations, Ltd.,* 823 F.Supp. 571, 578 (N.D.Ill.1993), *aff'd in relevant part, rev'd in part,* 55 F.3d 1276 (7th Cir.1995); *see also, Rush v. Scott Specialty Gases, Inc.,* 930 F.Supp. 194, 202 (E.D.Pa.1996) (court remits punitive damage award in Title VII case from $3,000,000 to $300,000, but also notes that defendant's attitude at trial indicated the defendant did not accept that the treatment plaintiff suffered was wrong in any way); *Hurley v. Atlantic City Police Dept.,* 933 F.Supp. 396, 426 (D.N.J.1996) (court upholds $700,000 punitive damage award in sex discrimination case where there was substantial evidence of sexual harassment by upper management and the court stated, "An un-

---

**20.** *See also Atlas Food Systems v. Crane National Vendors, Inc.* 99 F.3d 587, 595 (4th Cir.1996) (noting comparative advantage trial judge has over jury in determining amount of punitive damage award); *see id.* ("The court's review of the amount of a punitive damage award should involve comparison of the court's independent judgment on the appropriate amount with the jury's award to determine whether the jury's award is so excessive as to work an injustice.").

**21.** "Although [*BMW*] examined the excessiveness of punitive damages awarded in a state court, the universal premise of Supreme Court's due process reasoning suggests that the same considerations apply equally to the review of punitive damages awarded in federal court." *Lee v. Edwards,* 101 F.3d 805, 809 n. 2 (2d Cir.1996) (citation omitted).

professional atmosphere of intolerance and misogyny suffused the ACPD.").[22]

In the instant action, there was no evidence that Pfizer has a propensity to engage in future discriminatory conduct and there were no allegations that Pfizer had a pattern of discriminating against employees with disabilities. "In the absence of a history of noncompliance with known statutory requirements, there is no basis for assuming that a more modest sanction would not have been sufficient to motivate full compliance...." *BMW*, — U.S. at —, 116 S.Ct. at 1603. This court finds Pfizer's conduct to be far less reprehensible than other cases in which large punitive damage awards were made. This factor, therefore, weighs heavily in favor of finding the punitive damage award to be excessive.

### b. DISPARITY BETWEEN INJURY AND AWARD

"In considering the ratio between a punitive damage award and the actual harm inflicted, the second [*BMW*] factor, 'the proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred.'" *Lee v. Edwards*, 101 F.3d 805, 810–11 (2d Cir.1996), *quoting BMW*, — U.S. at —, 116 S.Ct. at 1602. In the case at bar, the jury found that Geuss suffered $165,250 worth of losses ($65,000 in back pay, $89,000 in front pay, and $11,250 in compensatory damages), and also awarded him $150,000 in punitive damages. In addition, the ADA permits a prevailing party to recover reasonable attorney's fees. 42 U.S.C. § 12205. Since the punitive damage award is roughly equal to the jury's findings of Geuss' actual losses, the concern raised in *BMW* about the disparity between the punitive damage award and actual damages is not present here. *See BMW*, — U.S. at —, 116 S.Ct. at 1603, *quoting TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S.

443, 482, 113 S.Ct. 2711, 2732–33, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting) (500 to 1 ratio between punitive damage award and harm to plaintiff "must surely 'raise a suspicious judicial eyebrow.'"). This factor, therefore, weighs in favor of the reasonableness of the award.

### c. SANCTIONS FOR COMPARABLE MISCONDUCT

"The third 'indicium of excessiveness' is provided by '[c]omparing the punitive damages award and the civil or criminal penalties' for comparable misconduct." *Continental Trend Resources, Inc. v. OXY USA Inc.*, 101 F.3d 634, 640 (10th Cir.1996), *quoting BMW*, — U.S. at —, 116 S.Ct. at 1603. Under the ADA, damages for compensatory and punitive damages are capped at different amounts depending on the size of the employer. 42 U.S.C. § 1981a(b)(3). The backpay award is not included in the limitation on damages. 42 U.S.C. § 1981a(b)(2). Neither side has presented any argument concerning the potential applicability of the damage caps. For the purposes of 42 U.S.C. § 1981a(b)(3), the award in this case totalled $250,250, which is within the limit for companies that have more than 500 employees. 42 U.S.C. § 1981a(b)(3)(D). Without any further information about the size of Pfizer, the court cannot conclusively determine whether the jury's award is excessive in relation to the damage cap.

### d. REMITTITUR OF PUNITIVE DAMAGES

After considering all of the factors discussed above, this court finds that the jury's award of $150,000 shocks the court's conscience, and therefore orders a remittitur of $132,500. In reaching this conclusion, the court relies heavily on the fact that Pfizer's conduct is far less blameworthy than the conduct exhibited in other cases where large punitive damage verdicts were awarded. The court also is of the opinion that the

---

**22.** This court notes that the recent case of *Coleman v. Kaye*, 87 F.3d 1491 (3d Cir.1996), *petition for cert. filed*, U.S. Nov. 4, 1996 (No. 96–712) did reinstate a punitive damage award of $350,000 against a county defendant in a sex discrimination case. However, the possible excessiveness of this punitive damage award was not before the court so it did not address the excessiveness issue. Furthermore, in *Coleman*, there was evidence that one of the defendants committed two acts of intentional discrimination even after being put on notice of a prior act of discrimination against the same plaintiff. *Id.* at 1509.

liability issue was close. The court finds that a $17,500 punitive damage award is the maximum amount supported by the evidence. *See Dunn*, 1 F.3d at 1383 (court should order plaintiff to remit the portion of the verdict in excess of the maximum amount supportable by the evidence).[23] This amount should also suffice to punish Pfizer and deter it from engaging in discriminatory conduct in the future.

 In the instant action, the issues of liability and damages are too interwoven to allow a fair determination of damages apart from liability. *Hurley*, 933 F.Supp. at 426. Consequently, a new trial on all issues will be ordered if Geuss does not accept the remittitur. *Id.*

## E. *OTHER ARGUMENTS MADE BY DEFENDANTS*

Defendants make two additional arguments, neither of which merits extensive discussion.

### 1. *ADMISSION OF LAB COAT*

 Defendants argue that admission of Geuss' lab coat was erroneous because there was no evidence that the lab coat was in the same condition at trial as it was when Geuss wore it while working for the Defendants. Weaknesses in the chain of custody, however, go to the weight to be given to the item rather than its admissibility.[24] Here, Geuss testified that the item in question was the lab coat he wore while working for Pfizer. He had a practice of placing the lab coat in a plastic bag every day after work and taking it home to be washed. (Trial Tr. 5/7, 126). The last time Geuss placed the coat in a plastic bag was in September or October of 1992, and to his knowledge, the bag had not been opened until the coat was displayed in court. *Id.* The court finds that Geuss' testimony provided sufficient evidence upon which to admit the lab coat.

### 2. *SHIFTING BURDEN OF PROOF*

 Defendants claim the court did not properly instruct the jury on the shifting burden of proof enunciated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Defendants assert that the court should have told the jury that if Defendants presented a legitimate, non-discriminatory reason for Geuss' termination, then it was Plaintiff's burden to show not only that Defendants' reasons were false but also that unlawful and intentional discrimination was the true reason for Defendants' decision to terminate him. The court's jury charge properly instructed the jury about the elements Geuss had to prove to make out a prima facie case and explained how Pfizer could prevail by demonstrating undue hardship. The court also told the jury that Geuss had the ultimate burden of proving Pfizer discriminated against him. The Third Circuit Court of Appeals has recently made it clear that no additional evidence is needed for a jury to make a finding of intentional discrimination once the plaintiff establishes a prima facie case and the jury rejects the defendant's proffered reason for the employment decision. *Olson v. General Electric Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996), *citing Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061 (3d Cir.1996) (en banc). This court did not err in its instruction.[25]

**23.** *See also Ramsey v. American Air Filter Co. Inc.*, 772 F.2d 1303, 1314 (7th Cir.1985) (A punitive damages award "must be supported by the record and may not constitute merely a windfall to the prevailing party."). In this case, the court finds that the jury's punitive damage award constituted a substantial windfall for Geuss.

**24.** *See United States v. Shaw*, 920 F.2d 1225, 1229–30 (5th Cir.), *cert. denied*, 500 U.S. 926, 111 S.Ct. 2038, 114 L.Ed.2d 122 (1991):

This court has repeatedly held that any break in the chain of custody of physical evidence does not render the evidence inadmissible but

instead goes to the weight that the jury should accord that evidence. Once the trial court makes a preliminary determination that a jury could reasonably conclude that the disputed authenticity has been established, the district judge may admit the evidence at his discretion. (citation omitted).

**25.** In its motion, Defendants objected to two other comments the court made during the trial. *See* Defendants' Motion at para. 8, 9a. These two issues were not briefed in Defendants' Memorandum of Law, so the court deems these issues to be waived.

## V. CONCLUSION

To summarize, Pfizer's motion for judgment as a matter of law is denied. Pfizer's motion for a new trial is denied. This denial, however, is conditioned upon Geuss' acceptance of a remittitur of his punitive damages award from $150,000 to $17,500. An appropriate order follows.