**In re: BAYSIDE PRISON LITIGATION**

**Tavius Lindsey**

v.

**William Fauver; Scott Faunce; Gary Hilton, Appellants.**

No. 07–3739.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) May 20, 2009.

Filed: July 22, 2009.

Paul J. Hirsh, Esq., Morristown, NJ, Lawrence W. Lindsay, Esq., Justin T.

Loughry, Esq., Loughry & Lindsay, Camden, NJ, for Tavius Lindsey.

Mark M. Roselli, Esq., Roselli, Griegel & Haumann, Hamilton Square, NJ, for Appellants.

Before: RENDELL and GARTH, Circuit Judges, and VANASKIE, District Judge.*

RENDELL, Circuit Judge.

This appeal comes to us from a jury verdict in favor of plaintiff inmate Tavius Lindsey and against defendants Scott Faunce, the Chief Administrator of Bayside State Prison; William Fauver, the Commissioner of Corrections; and Gary Hilton, the Deputy Commissioner.[1] Damages were awarded against defendants in the amounts of $18,000, $12,000, and $12,000, respectively.[2] Lindsey's suit under 42 U.S.C. § 1983 arises from events that occurred during a lockdown in the prison following the death of a guard. We must decide, first, whether defendants are entitled to a new trial because the District Court improperly permitted Lindsey to testify about his injuries, and second, whether legally sufficient evidence supported the jury's determination of liability and damages. We conclude that Lindsey's testimony was admissible under Fed. R.Evid. 701, which governs opinions offered by a lay witness, and that adequate evidence supported the jury verdict. We will thus AFFIRM the order of the District Court.

Because we write solely for the benefit of the parties, we confine our discussion to the facts salient to this appeal. Lindsey's claims arose during a lockdown of Bayside

---

1. Hilton is also referred to in the record as the Commissioner's "Chief of Staff." Defendants' Appendix ("D.A.") 830a.

2. The jury awarded compensatory damages of $3,000, $2,000, and $2,000, and punitive damages of $15,000, $10,000, and $10,000, against Faunce, Fauver, and Hilton, respectively.

State Prison ("Bayside"), ordered after the death of a guard. Lindsey alleges that he was severely beaten by Special Operations Group ("SOG") personnel deployed to secure the facility during the lockdown. Lindsey subsequently filed suit under 42 U.S.C. § 1983, claiming that defendants were deliberately indifferent to a substantial risk of serious harm to him, when they failed to respond to numerous allegations of inmate abuse. Following a jury trial, judgment was entered in favor of Lindsey and against defendants. Defendants requested a new trial on alternative grounds—the District Court improperly permitted Lindsey to testify about his injuries, and the verdict was not supported by sufficient evidence. Judge Kugler denied the motion in its entirety, and defendants appealed.[3]

Defendants' first contention is that the District Court erred in permitting Lindsey to testify about his recurring headaches and wrist pain since the date of the assault, thus entitling defendants to a new trial. Where a party seeks a new trial, we accord substantial deference to the decision of the trial judge, "who saw and heard the witnesses and has the feel of the case which no appellate printed transcript can impart." *Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 187 (3d Cir.1990) (quoting *Cone v. West Virginia Pulp & Paper Co.*, 330 U.S. 212, 216, 67 S.Ct. 752, 91 L.Ed. 849 (1947)). Where a motion for new trial is based on an evidentiary ruling, "[w]e review a district court's decision to admit or exclude evidence for abuse of discretion, although our review is plenary as to the district court's interpretation of the Federal Rules of Evidence." *Marra v.*

*Philadelphia Hous. Auth.*, 497 F.3d 286, 297 (3d Cir.2007). We will not disturb the district court's exercise of discretion "unless there is a definite and firm conviction that the court below committed a clear error of judgment." *Hanover Potato Products, Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir.1993)(quoting *Ferrero, U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 48 (3d Cir.1991)).

 Here, Lindsey testified that he has suffered chronic headaches and wrist pain since the date of the assault. D.A. 725–731a. Confining his testimony to his subjective sensations, Lindsey recounted the location, intensity, and onset date of his pains. He did not offer a medical diagnosis, prognosis, or other opinion requiring special expertise. On these facts, we easily conclude that Lindsey's testimony, which was "rationally based on ... [his] perception" and was "not based on scientific, technical, or other specialized knowledge," was admissible under Fed. R.Evid. 701. *See Cotton v. Consolidation Coal Co.*, 457 F.2d 641, 643 (6th Cir.1972) ("It has long been recognized that a lay witness may testify as to his own physical condition or that of another person provided such witness first states the detailed facts and then gives his conclusions."); *see also Hrichak v. Pion*, 498 F.Supp.2d 380, 382 (D.Me.2007) ("[A] lay witness ... may testify 'regarding subjective symptoms including, but not limited to, pain from or the existence of bruises, cuts, and abrasions resulting from the beating ... because it does not require the knowledge of an expert witness.'" (quoting *Townsend v. Benya*, 287 F.Supp.2d 868, 875 (N.D.Ill. 2003))).[4]

---

3. The District Court exercised jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1334. Our jurisdiction is proper under 28 U.S.C. § 1291.

4. Defendants also maintain that the District Court's admission of hearsay evidence war-

rants a new trial. Lindsey testified that his doctor told him that a mark on his face was "scar tissue from what took place [the assault]." D.A. 730a. Even assuming, *arguendo*, that this statement was inadmissible, no prejudice resulted: the statement was brief,

■ Alternatively, Defendants contend that Lindsey's testimony was insufficient to establish *causation*—that his assault was responsible for his recurring headaches and wrist pain. "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991). Lindsey's detailed testimony about the location and force of the blows dealt to his head and face, the manner in which guards affixed his handcuffs, and his recurring cranial and wrist pain near the points of impact, were sufficient for a jury to infer that the assault caused his injuries. Such an inference was particularly reasonable here, where no contrary evidence was introduced, no alternative explanation for plaintiff's recurring headaches was offered, and no meaningful impeachment of plaintiff's testimony occurred. We thus decline to disturb the jury verdict.[5]

Next, defendants contend that the verdict was unsupported by adequate evidence. In *Farmer v. Brennan,* the Supreme Court clarified that supervisory liability may attach when an "official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoted in *Kaucher v. County of Bucks,* 455 F.3d 418, 427 (3d Cir.2006)). Defendants insist that

they were unaware of allegations of inmate abuse, and that the decision to deploy and maintain a SOG presence at Bayside was necessary to secure the facility. We consider the evidence relevant to each defendant in turn.

■ Adequate evidence supported the jury's determination that Faunce, Bayside's administrator, knew, but chose to disregard, allegations of inmate abuse. Ombudswomen Maggie Aguero, Margaret Lebak, and Jessie Rojas testified that they communicated to Faunce, verbally and in writing, that they received numerous allegations of inmate abuse. D.A. 678–680a, 685a, 686–89a, 707–708a. In fact, Faunce acknowledged that he received one to two allegations of inmate abuse daily from the lockdown's inception. D.A. 674–75a. Despite the seriousness of these reports, Faunce, according to Aguero, dismissed them, suggesting that inmates' injuries resulted instead from their "slipping inside their cells and injuring themselves against the metal bunks." D.A. 708a. Faunce took no specific measures to investigate or curb the abuse. We believe that a jury could rationally conclude on these facts that Faunce acted with deliberate indifference to plaintiff's rights.

■ Adequate evidence also supported the jury's determination that Hilton, the Deputy Commissioner, was aware of allegations of inmate abuse. Aguero testified that she communicated to Hilton reports of abuse, inmates' visible physical injuries, and Faunce's lackluster response. D.A. 707–709a. Confronted with this information, Hilton did nothing. D.A. 708a. More troublesome, when Aguero indicated her desire to memorialize her observations,

---

isolated, and largely duplicative of Lindsey's own testimony about his facial injuries.

**5.** Defendants also argue that plaintiff's counsel improperly argued in his summation that

Lindsey suffered "lasting and permanent" injuries to his head and wrist from the assault. Because this assertion rested on an adequate evidentiary foundation, this argument was proper.

Hilton directed her "not to put it in writing." D.A. 709a. Hilton also acknowledged that he did not confront SOG personnel after his conversation with Aguero. D.A. 770a. When asked whether he observed any injured inmates during his numerous visits to Bayside during the lockdown, Hilton vacillated.[6] D.A. 770–71.

Defendants respond that Hilton learned of inmate abuse only *after* Lindsey's assault on August 14, 1997, and thus the jury's imposition of supervisory liability was improper. Persuaded by this argument, the dissent notes that, although Aguero testified that she met with Faunce at 8:00 a.m. on August 14, a time sheet indicated her arrival at Bayside on August 14 at *3:00 p.m.*—several hours after Lindsey was assaulted. Further, the dissent maintains that Aguero's discussion with Hilton *necessarily* occurred after Lindsey's assault on August 14, 1997, because Aguero discussed allegations of inmate abuse with Faunce on August 14, and because the record is clear that Aguero met with Hilton only *after* her meeting with Faunce. This chronology, the dissent reasons, confirms that Aguero met with Hilton *after* Lindsey's assault, and that the jury's contrary conclusion was unsustainable.

Although the dissent correctly observes that Aguero met with Hilton after she briefed Faunce, the dissent assumes as fact a proposition that the jury was within its discretion to reject—that the meeting between Aguero and Faunce occurred on *August 14, 1997.* Adequate evidence supported the jury's apparent determination that Aguero and Faunce met on *August 13,* not August 14, 1997, and that Aguero promptly apprised Hilton of allegations of inmate abuse—*before* Lindsey's assault. Describing her activities on August 13, Aguero testified, "I also was briefed by the Administrator [Faunce]." A. 707a. On cross-examination, Aguero reiterated this fact, noting that she discussed allegations of inmate abuse with Faunce on August 13, 1997. A. 714a. Whether Aguero had further discussions with Faunce on August 14, 1997, as the dissent maintains, is of no moment; Aguero's testimony was sufficient to permit a jury to conclude that Aguero discussed guard misconduct with Faunce on August 13, 1997, and with Hilton shortly thereafter. Accordingly, we reject the dissent's conclusion that the evidence forecloses an inference that Aguero communicated allegations of inmate abuse to Hilton prior to Lindsey's assault on August 14.

There was also uncontroverted evidence that Hilton toured the Bayside gymnasium on August 2, 1997, where inmates had been temporarily relocated, and that several prisoners in the gym had visible, fresh cuts and bruises. A. 677–78a. A jury could reasonably conclude that these inju-

---

6. Hilton testified as follows in his deposition:
Q: [N]ow, as a result of your travels through Bayside and (sic) lockdown, did you examine—did you see any evidence of inmates who had, you know, even bruised, cuts or abrasions, any of that stuff?
A: Nothing that was—if they did, it wasn't significant enough that—I mean I wasn't going up and let me—but I mean there were no inmates that couldn't stand up or that, you know, that had been bloodied up and nobody had cleaned them up or anything like that. And there weren't any medical reports of at that level of and essentially if there had been in any judgment systematic brutality, systematic brutality escalates, it starts with a push, it then goes to something more than a push, then a punch, then a strike. Once systematic brutality starts, it escalates and a push becomes a shove, a shove becomes a punch, et cetera, et cetara. And I did not see that nor was it being reported to me.
D.A. 771a. In light of Hilton's imprecise and evasive response, and other evidence adduced at trial, a jury could reasonably conclude that Hilton was aware of physical abuse.

ries effectively apprised Hilton of inmate mistreatment.[7] *See Beers–Capitol v. Whetzel,* 256 F.3d 120, 133 (3d Cir.2001) ("[A] defendant's knowledge of a risk can be proved indirectly by circumstantial evidence."); *see also Farmer,* 511 U.S. at 842, 114 S.Ct. 1970 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Finally, a jury could conclude that it was unrealistic that Hilton, who, as Deputy Commissioner, was charged with monitoring and reporting significant developments at Bayside to the Commissioner during the lockdown, was oblivious to inmate abuse. In *Farmer,* 511 U.S. at 842–43, 114 S.Ct. 1970, the Supreme Court explained:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk".

As discussed, Hilton visited Bayside repeatedly during this time period specifically to monitor lockdown conditions. A. 678a, 770a. Moreover, Hilton communicat-

ed regularly with Bayside officials about the lockdown, including Faunce, who acknowledged receiving one to two complaints of inmate abuse daily since the lockdown's inception, and who was regularly updated on prison conditions by ombudswomen deployed to the prison. A. 694a, 696a, 769–70a. The record reflects that this chain of command was adequate to inform Hilton of significant developments at Bayside, including, presumably, repeated reports of inmate abuse. D.A. 769–771a. On this record, a "trier of fact [was entitled] to find that the defendant-official had actual knowledge of the risk," having been exposed to information from multiple sources about that risk, and not that the defendant-official merely "should have" known of the risk. *Farmer,* 511 U.S. at 842–43, 114 S.Ct. 1970.

■ Legally sufficient evidence also supported the jury's determination of liability with respect to Fauver, the Commissioner of Corrections. The jury could reasonably conclude that Hilton and Faunce timely conveyed reports of inmate abuse to Fauver, who confirmed that he regularly "talk[ed] to principals" during the lockdown. D.A. 769a. In his deposition, Hilton explained that, "[E]veryone reported through me [Hilton] to the commissioner," and that he had "gotten the information [alleged inmate abuse] to the commissioner in a timely and effective manner." D.A. 769–771a.[8] Despite these reports, there is no evidence that Fauver directed a special investigation, disciplined responsible personnel, modified lockdown procedures, or implemented other safeguards to avoid fu-

---

7. As discussed, when asked whether he encountered any injured inmates in the gym, Hilton vacillated. Downplaying the severity of the injuries observed, Hilton testified that he did not see any inmates who were "bloodied up" or "couldn't stand up." A. 771a. The jury, however, was entitled to disbelieve Hilton's characterization of inmates' injuries.

8. When asked about whether Hilton or Faunce indicated to him the problems they were facing at the Bayside prison after the murder, Fauver did not deny being told of the situation, but rather stated that he could not recall. D.A. 769a.

ture incidents. On this record, we cannot conclude that the jury verdict "cries out to be overturned or shocks the conscience." [9] *Williamson*, 926 F.2d at 1353.

■ Defendants' final contention is that inadequate evidence supported the punitive damages verdict.[10] Judge Kugler properly instructed the jury, advising them that punitive damages could be imposed if "defendants engaged in reckless or callous indifference ... to the plaintiff's federally protected right[s]," and if compensatory damages were insufficient to deter misconduct in the future. D.A. 814a. As discussed, Lindsey introduced evidence sufficient for a reasonable jury to conclude that Faunce, Hilton, and Fauver, who were aware, but chose to disregard, reports of inmate abuse, acted with deliberate indifference to plaintiff's constitutional rights. *See Farmer*, 511 U.S. at 836, 114 S.Ct. 1970 ("[A]cting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."). Other facts also supported a punitive damages verdict here: that Lindsey suffered physical rather than solely economic harm; that Fauver, Hilton, and Faunce occupied unique positions of authority and responsibility; and that punitive damages were potentially necessary to deter administrative complacency and ensure inmate safety. Accordingly, the imposition of punitive damages was not improper.

For the foregoing reasons, the order of the District Court will be AFFIRMED.

GARTH, Circuit Judge, dissenting in part and concurring in part:

I agree with Judge Rendell that the jury verdict in favor of plaintiff inmate Tavius Lindsey should be affirmed as to Scott Faunce. I write separately, however, because as to Fauver and Hilton, there was insufficient evidence that they were deliberately indifferent. Accordingly, as to those two defendants, I would vacate the jury verdict.

A finding of deliberate indifference requires proof of subjective knowledge, not objective knowledge, "meaning that the official must *actually* be aware of the existence of the excessive risk; it is not sufficient that the official *should* have been aware." *Beers–Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir.2001) (emphases add-

---

9. We also reject Defendants' contention that insufficient evidence supported the jury's finding that Fauver was aware of allegations of inmate abuse before Lindsey's assault. First, Hilton confirmed that he communicated Aguero's report of inmate abuse to Fauver in a "timely and effective" manner. A. 771a. Second, Fauver acknowledged that he regularly communicated with principals, including Faunce and Hilton, about prison conditions during the lockdown. A. 769a. Because Faunce testified that he received daily complaints of inmate abuse from the lockdown's inception, a jury could rationally conclude that Faunce timely communicated these complaints to Fauver, and that Fauver thus knew of allegations of inmate abuse before August 14, 1997.

10. Defendants challenge the sufficiency of the evidence supporting the punitive damages

verdict—not the specific sum awarded. Although "remittitur" appears in a caption in defendants' appellate brief, the term is wholly absent from the argument section of the brief, which does not mention the Due Process Clause of the U.S. Constitution or urge that the amount of damages awarded was excessive. Appellants' Br. at 32–33 ("[T]here was no evidence that any of the Defendants acted in such a manner [with reckless disregard of Plaintiff's constitutional rights], and as such Plaintiff presented no evidence to support any award of punitive damages against Defendants. Thus, the award of punitive damages against Defendants is unsupported by the record and must be vacated."). Because defendants' sole contention is that insufficient evidence supported the punitive damages verdict, we confine our analysis to this argument.

ed). Although subjective knowledge "can be proved by circumstantial evidence," the excessive risk must be "so obvious that the official must have known of the risk." *Id.*

The relevant question here is not whether Hilton and Fauver did take, or would have taken, reasonable steps to prevent the harm to Lindsey; that question is only reached if it is first established that Hilton and Fauver had actual, subjective knowledge of the risk of harm before Lindsey was assaulted such that they could have taken action to prevent it. Without that timely knowledge, there can be no deliberate indifference.

The facts cited by the majority do not meet this standard. The majority relies primarily on the fact that ombudswoman Maggie Aguero met with Hilton and conveyed her concerns that prisoners were being abused. But Aguero's testimony never establishes when the meeting occurred. Aguero appears to have met with Hilton sometime on August 14, the same day that Lindsey was assaulted.[11] According to her testimony, she discussed her concerns first with Faunce when she arrived at Bayside at approximately 8:00 A.M. App. 714a. This statement, however, was contradicted by a timesheet that recorded her arrival at Bayside at 3:00 P.M.—several hours after Lindsey was assaulted. App. 715a. This timing is relevant because Aguero did not meet with Hilton until after her initial meeting with Faunce, and Fauver in turn learned of Aguero's concerns through Hilton. App.

771a. Without any testimony as to when Aguero met with Hilton, the jury could not have determined, and would have no basis for inferring, that Hilton and Fauver had the requisite knowledge to be liable for the assault on Lindsey.[12]

To bolster its position, the majority also argues that Hilton was evasive when asked whether he had witnessed any injured inmates during earlier tours of Bayside. Although his answer was equivocal as to whether he saw injured inmates, he clearly denied that he witnessed anything suggesting systematic brutality. Even if he did observe injured inmates, it is not enough that he *should* have known that they were being assaulted by SOG officers; he must have had *actual* knowledge of the excessive risk of harm, or the excessive risk must have been patently obvious. All that was proffered was the suggestion that someone present at Bayside at the time *should* have seen the bruises, cuts, and abrasions on these inmates, and therefore he *should* have known that rampant abuse was occurring. These "should haves" do not satisfy our deliberate indifference standard, and therefore cannot constitute sufficient evidence to hold Hilton and Fauver liable.

Accordingly, I respectfully dissent as I would affirm the jury verdict as to Faunce, but vacate it as to Hilton and Fauver.

11. The majority responds at great length that the meeting between Aguero and Hilton might have occurred on August 13 rather than August 14. The point is simply that the timing was, and remains, wholly unknowable based on the record available to the jury. In any event, the timeline suggested by the majority is especially improbable given that, when Aguero reported to Faunce on the evening of August 13, she had just completed a 14–hour shift, leaving open to question when

she could have arranged an after-hours meeting with Hilton. App. 706a, 770a. A midnight rendezvous seems even less likely to have occurred in light of Aguero's testimony that she still remained skeptical of the inmates' reports of abuse at that time. App. 711a.

12. Notably, the District Court did not rely on, or even mention, this meeting in its opinion.